Peter **PAPPAS**, as Trustee of the Independent Insulating Glass Company Employees' Pension Plan and Trust and Individually, and Independent Insulating Glass Company, Plaintiffs–Appellants,

v.

**BUCK CONSULTANTS, INC.**, and Bernard Hartt, Defendants–Appellees.

No. 90–1057.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1990.

Decided Jan. 23, 1991.

532

William Anspach, John H. Ward, Karen K. Litscher, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for plaintiffs-appellants.

Charles B. Wolf, John J. Jacobsen, Jr., Philip A. Mowery, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Peter Pappas and Independent Insulating Glass Company brought suit against the former actuary of Independent Insulating Glass's pension plan and the actuarial firm he works for, alleging that the actuary breached fiduciary duties under ERISA and asserting a private right of action arising from misrepresentations contained in forms submitted to federal authorities charged with regulating ERISA plans. In addition, Pappas and IIG (collectively "Pappas" or "plaintiffs") alleged state-law professional malpractice, breaches of common-law fiduciary duties, and fraud. The district court dismissed plaintiffs' federal causes of action for failure to state a claim and dismissed their pendent state-law causes of action for want of subject matter jurisdiction. We affirm.

## I. FACTS AND PRIOR PROCEEDINGS

Until September 30, 1987, Irving Feinman was the president of plaintiff Independent Insulating Glass ("IIG"), an Illinois corporation based in a southwestern suburb of Chicago. He also owned half of IIG's stock. In early 1987, Feinman began negotiations with plaintiff Peter Pappas, who owned the other half of IIG's stock, concerning the sale of his interest in IIG to Pappas. In addition to owning all of IIG's stock, Pappas and Feinman were co-trustees of IIG's Pension Plan ("Plan"), which was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 832, 29 U.S.C. §§ 1001–1461.

To facilitate their operation of the Plan, Pappas and Feinman consulted with an actuary, defendant Bernard Hartt, from 1982 onward. In 1985, Hartt joined defendant Buck Consulting, an actuarial firm located in Chicago. Among the tasks Hartt performed for the IIG Plan was the filing of annual reports with the Internal Revenue Service concerning the actuarial valuation of the Plan, as required under ERISA §§ 103–04, 29 U.S.C. §§ 1023–24. These reports were used to calculate the amounts IIG was required under ERISA to contribute to the Plan to provide anticipated benefits to Plan beneficiaries. See 29 U.S.C. § 1082; 26 U.S.C. § 412.

In connection with Feinman's sale of his IIG shares to Pappas, Feinman and Pappas agreed that they would terminate the IIG Plan and that Feinman would take a lump-sum distribution of the benefits he had accrued during his years with IIG. Because of Feinman's long employment with IIG, his high salary, and his age, Feinman's benefits under the Plan were larger than those of all other Plan participants combined. The large size of Feinman's distribution relative to the total assets in the IIG Plan led Pappas and Feinman to seek the advice of Hartt and Buck Consultants (collectively, "Hartt" or "defendants") concerning the distribution of benefits to Feinman, the termination of the Plan that would follow this distribution, and the creation of a new Plan after the sale and distribution. According to plaintiffs, Hartt erred in advising the Plan concerning how large a distribution it could afford to make to Feinman while preserving the financial integrity of the new Plan that would be created from the remaining assets of the former Plan. One error Pappas alleges is that in calculating the present value of Plan assets, Hartt applied a seven percent discount rate rather than the five percent discount rate the Plan provided would be used in calculating the size of a lump-sum distribution. The effect this mistake had, Pappas claims, was to understate the Plan's lump-sum liability to its participants and, consequently, to encourage Pappas and Feinman to consent to an excessive distribution to Feinman. This error alone, Pappas alleges, would have left the Plan underfunded by nearly 100,000 dollars, assuming that the remaining employees withdrew only the benefits allowed to them under ERISA, not the higher benefits provided for under the IIG Plan.

The second mistake Hartt made, according to Pappas, negated that assumption. Pappas claims that Hartt and Buck advised the Plan incorrectly concerning the timing of the Plan termination. According to Pappas, Hartt should have anticipated the passage of the Pension Protection Act of 1987,

Pub.L. No. 100–203, 101 Stat. 1330–333, which amended ERISA to require that, upon termination of an ERISA plan, beneficiaries whose plans provided benefits in excess of those required under ERISA must receive their plan benefits rather than the lower benefits required under ERISA. Since IIG, acting on the advice of Hartt, did not terminate its Plan until after the effective date of the 1987 Act, it locked in the benefits it was obligated to pay to all current beneficiaries at the higher Plan-mandated amount rather than the lower ERISA-mandated amount. Another consequence of the decision to delay the termination was that it took place following the October 1987 stock market crash, which sharply reduced the value of assets in the IIG Plan.

The ultimate result of these mistakes by Hartt, Pappas alleges, is that the IIG Plan is now under-funded by over 400,000 dollars. Pappas brought suit against defendants to recover this amount under a variety of theories arising under state and federal law. In Count 1, Pappas, suing as a Plan fiduciary and beneficiary, and IIG allege that Buck and Hartt committed actuarial malpractice under Illinois law. In Count 2, again suing as a Plan fiduciary and a beneficiary, Pappas alleges that defendants breached statutory fiduciary duties imposed under ERISA. Count 3, pleaded in the alternative to Count 2, alleges that defendants breached common-law fiduciary duties. In Count 4, Pappas, as a Plan fiduciary and participant, and IIG allege violations of ERISA arising from the misrepresentations allegedly made by defendants in annual reports they submitted to the Internal Revenue Service as required under ERISA. Pappas sues as an individual in Count 5, alleging that defendants committed common-law fraud when they failed to disclose or concealed the shortfall in the Plan that would occur following the distribution to Feinman. The effect of this misrepresentation was to cause Pappas to underestimate the shortfall and to pay more for Feinman's share of IIG than it was worth given ERISA's requirement that Pappas, now IIG's sole owner, contribute to the Plan to restore its financial health.

The district court dismissed the two counts in Pappas's complaint that arose under federal law, Counts 2 and 4. As to Count 2, the district court concluded that Pappas's complaint failed to allege facts sufficient to establish that defendants fit the statutory definition of a fiduciary under ERISA. The facts alleged, the district court reasoned, did not amount to the exercise of "discretionary authority, control or responsibility over the Plan or its assets." No. 89 C 6137, Memorandum Opinion (N.D. Ill., Dec. 12, 1989) ("Mem. Op.") at 5, 1989 WL 157517. According to the district court, "the rendering of professional actuarial advice alone" did not turn an actuary into an ERISA fiduciary. *Id.* In reaching this result, the district court rejected Pappas's reliance on certain language accompanying a committee draft of ERISA that supported the expansive definition of fiduciary he sought to have the court apply. The district court concluded that " 'the House Report was superseded and, in effect, contradicted' " by language in the Conference Report accompanying the final version of ERISA that placed a more restrictive gloss on the statutory definition of a fiduciary. *Id.* at 6 (quoting *Painters of Philadelphia District Council v. Price Waterhouse*, 879 F.2d 1146, 1150 n. 4 (3d Cir.1989)).

Pappas's other federal claim was contained in Count 4, in which he sought to impose liability on defendants for making misrepresentations in the actuarial reports concerning the Plan they filed with the Internal Revenue Service as required under ERISA. The district court concluded that ERISA created no statutory cause of action to remedy misrepresentations made by anyone but a plan administrator. The district court also responded to three alternative theories of liability Pappas proposed: first, that there exists an implied cause of action against a nonadministrator whose advice leads to the impairment of an ERISA plan; second, that courts should create such an action under the federal common law of ERISA; and third, that defendants might be liable for inducing Pappas or Feinman, as trustees of the IIG Plan, to breach their fiduciary duties by leading them to approve

the excessive distribution to Feinman that left the Plan under-funded. As to the first two arguments, the district court, noting the comprehensiveness of ERISA's remedial scheme, refused to imply a remedy that Congress had not expressly created. *Id.* at 7 (citing *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985); *Nieto v. Ecker*, 845 F.2d 868, 872–73 (9th Cir.1988)). As to the last, the district court observed that Pappas had not alleged that either he or his co-trustee Feinman had ever breached the fiduciary duties each owed to the Plan. Mem. Op. at 7–8.

Having dismissed all of plaintiffs' federal claims at an early stage of the litigation, the district court elected to dismiss their pendent state-law claims as well.

## II. THE DEFINITION OF A "FIDUCIARY" UNDER ERISA

■ ERISA § 409 creates a federal cause of action against "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" by ERISA. 29 U.S.C. § 1109(a); *see id.,* § 1132(a)(2) (plan participants, beneficiaries, or fiduciaries may bring civil actions for breach of the obligations imposed under § 1109). ERISA's drafters defined the term "fiduciary" as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Pappas's first argument is that actuaries become fiduciaries when they give advice to plan trustees and invite reliance on that advice. They allege that Hartt knew that his erroneous actuarial work would not be questioned by the Plan's trustees, placing Hartt in a position to exercise "discretionary authority" over the management of the IIG Plan.

Like the district court, we are not convinced by this argument or the expansive reading of the ERISA definition of "fiduciary" upon which it is premised. Other courts that have considered the question have refused to fit professionals like accountants or attorneys within the statutory definition when all they have done is advise the trustees of an ERISA plan. *See, e.g., Anoka Orthopaedic Assocs. v. Lechner,* 910 F.2d 514, 517 (8th Cir.1990) (neither lawyer who designed plan nor consultant who administered plan were fiduciaries); *Painters of Philadelphia,* 879 F.2d at 1149–51 (accounting firm that performed statutorily required plan audits not fiduciary); *Nieto v. Ecker,* 845 F.2d 868, 870–71 (9th Cir.1988) (attorney who gave professional advice to a plan not fiduciary); *Yeseta v. Baima,* 837 F.2d 380, 385 (9th Cir. 1988) (neither attorney who reviewed Plan's compliance with law nor accountant who prepared tax returns and financial statements were fiduciaries). These courts supported this position by reading the terms "discretionary authority," "discretionary control," and "discretionary responsibility" in § 1001(21)(A) as speaking to actual decision-making power rather than to the influence that a professional may have over the decisions made by the plan trustees she advises. *See Painters of Philadelphia,* 879 F.2d at 1150 ("Since an auditor is without direct or indirect decision-making authority with respect to the affairs of the plan, it cannot be said that it exercises discretionary authority or responsibility in the administration of a plan.").

We see no reason why the reasoning of these cases should not extend to the actuarial profession. In drafting ERISA, Congress assigned a role to actuaries in the preparation of annual reports required to be filed with the Internal Revenue Service concerning plans organized under ERISA. *See* 29 U.S.C. § 1023(d) (requiring complete actuarial statement as part of annual report). A similar role was imposed on accountants, *see* 29 U.S.C. § 1023(a)(3)(A) (requiring ERISA plan administrators to engage accountants to examine information to be included in plan annual reports), a group whom other courts have found not to

be fiduciaries. Given the similarity in the roles assigned these two professions by ERISA, we are unwilling to conclude that Congress intended that actuaries would become fiduciaries but accountants would not.

As he did in the district court, Pappas points us to certain language in a committee comment accompanying an early draft of ERISA to support the view that Congress intended the definition of "fiduciary" to cover professionals—particularly actuaries—who provide their services to plan trustees. He relies on the following passage contained in "material in the nature of a committee report" inserted into the *Congressional Record* by Representative Perkins, Chairman of the House Committee on Education and Labor:

> The Committee has adopted the view that the definition of fiduciary is of necessity broad.... A fiduciary need not be a person with direct access to the assets of a plan.... Conduct alone may in an appropriate circumstance impose fiduciary obligations. It is the clear intention of the Committee that any person with a specific duty imposed on him by this statute be deemed to be a fiduciary....
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The assumptions utilized in determining plan liabilities and assets and the choice of appropriate valuation and fundings [*sic*] methodology are crucial to adequate funding of a plan. *The actuaries performing these plan services will fall within the definition of fiduciary and will be held to the duties imposed on such individuals, including personal liability for any breach of such duties.*

120 Cong.Rec. 3977, 3983 (February 25, 1974) (emphasis supplied), *reprinted,* 2 Legislative History of the Employee Retirement Income Security Act of 1974 at 3293, 3309 (*hereinafter,* "Legislative History"). Pappas argues that in interpreting § 1002(21)(A) the district court erred in failing to give this piece of legislative history the weight it deserves.

We concede that this language, standing alone, might well compel us to conclude that Congress intended actuaries like Hartt to become fiduciaries under ERISA whenever they perform the kinds of functions that Hartt performed for the IIG Plan. This language does not, however, stand alone. First, even assuming that in making his remarks, Congressman Perkins was speaking for his Committee (a fact by no means clear from the preface to the material he inserted in the *Record, see* 2 Legislative History at 3293), he headed one of two committees charged with drafting the House version of ERISA. The other committee did not speak to the issue of the duties to be imposed on actuaries or fiduciaries either in its bill or the Committee Report which accompanied the bill. Thus, while it is true that Representative Perkins' comments pertained to language that ultimately became ERISA's definition of the term "fiduciary," his gloss on that language does not evince a broad consensus among his colleagues that the statute was intended to mean what Representative Perkins thought it should mean.

Second, and more important, the conference committee report accompanying ERISA adopted a more limited view of the duties of professionals generally, and actuaries specifically, than that contained in Representative Perkins' statement. After the two House committees charged with drafting ERISA had consolidated their efforts and the House bill was passed, a House–Senate Conference Committee was named, which included Representative Perkins. 3 Legislative History at 4276. Explaining *the same language* Representative Perkins discussed in the comments in the *Record* excerpted above, the Conference Report observed that:

> While the ordinary functions of consultants and advisers to employee benefit plans (other than investment advisers) may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may, because of their special expertise, in effect be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or

control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

H.R. 1280, 93d Cong., 2d Sess. 323 (1974), *reprinted,* 3 Legislative History at 4590. Rather than adopting a blanket rule that any professional assigned statutory functions under ERISA becomes an ERISA fiduciary, the Conference Committee seems to have contemplated a more fact-intensive inquiry that looks to whether the professional transcended her "ordinary functions."

■ In interpreting the scope of fiduciary duties under ERISA, then, we are faced with a choice between two pieces of legislative history: Representative Perkins' statement, which may generously be characterized as the view of one of the two House committees with responsibility for drafting the House bill that preceded ERISA, and a statement in a Committee Report, which represents the views of *both* the House committees responsible for drafting the House bill *as well as* the views of the Senate. We choose to accord greater weight to the latter statement. "The most authoritative form of [legislative history] is a congressional report defining the scope and meaning of proposed legislation. The most authoritative report is a Conference Report acted upon by both Houses and therefore unequivocally representing the will of both Houses as the joint legislative body." *Commissioner v. Acker,* 361 U.S. 87, 94, 80 S.Ct. 144, 148, 4 L.Ed.2d 127 (1959) (Frankfurter, J., dissenting); *see also Payne v. Federal Land Bank,* 916 F.2d 179, 182 (4th Cir.1990) (" 'Inasmuch as the Conference Report represents the final statement of the terms agreed upon by both houses of Congress, next to the statute itself, it is the most persuasive evidence of the Congressional intent behind the enactment of the statute.' ") (quoting *Davis v. Lukhard,* 788 F.2d 973, 981 (4th Cir.), *cert. denied,* 479 U.S. 868, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986)); *Sierra Club v. Clark,* 755 F.2d 608, 615 (8th Cir.1985); *Monterey Coal v. Federal Mine Safety & Health Rev. Comm.,* 743 F.2d 589, 598 (7th Cir. 1984). These cases dictate our conclusion

that, when choosing between inconsistent pieces of legislative history, two houses are better than one.

Moreover, it is the language of the Conference Report, not Representative Perkins' earlier observations, that is echoed in regulations drafted shortly after ERISA's enactment by the Department of Labor. "The construction of the Department of Labor, which is entrusted with the enforcement of ERISA, is entitled to considerable weight." *Otto v. Variable Annuity Life Ins.,* 814 F.2d 1127, 1135 (7th Cir.1986), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988). Answering the question of whether "an attorney, accountant, *actuary* or consultant who renders legal, accounting, actuarial or consulting services to an employee benefit plan ... [becomes] a fiduciary to the plan solely by virtue of rendering of such services," the regulations respond that these consultants, when "performing their usual professional functions will ordinarily not be considered fiduciaries...." 29 C.F.R. § 2509.75–5 (1990) (emphasis supplied). Given the legislative history, administrative regulations, and judicial opinions supporting the narrower construction of § 1002(21)(A), the district court was justified in rejecting Pappas's argument for a broader construction based on the language of the Labor Committee draft. Like the district court, we do not agree with Pappas that the legislative history of ERISA's definition of the term "fiduciary" requires the conclusion that actuaries become fiduciaries under ERISA when they do no more than perform the tasks the statute assigns to them.

### III. DID HARTT AND BUCK BECOME FIDUCIARIES?

■ Pappas argues alternatively that even if the legislative history of ERISA's definition of "fiduciary" does not compel the conclusion that Hartt and Buck became fiduciaries merely by advising the IIG Plan, he alleged facts sufficient to state a claim that defendants became fiduciaries because their relationship with Feinman and Pappas transcended the ordinary functions of actuaries serving an ERISA plan. They point to their allegations that Hartt

concealed shortages in the Plan's funding, discriminated in favor of Feinman, and encouraged deferral of termination until after Feinman had received his distribution and the 1987 Pension Protection Act precluded recovery from Feinman of the amount he had been paid in excess of his ERISA-mandated benefits. Plaintiff's Brief at 23–24. These discretionary decisions were not revealed to Pappas, an unsuspecting Plan trustee, who relied on the superior knowledge of Hartt and Buck. *Id.* at 24.

We agree with plaintiff that there is no *per se* rule that prevents professionals who render advice to an ERISA plan from becoming fiduciaries. As the Conference Committee Report and Labor Department regulations indicate, the question of whether a consultant has or has not exercised such an unusual degree of influence over a Plan as to become a fiduciary involves factual determinations, *see Landry v. Air Line Pilots Ass'n.*, 901 F.2d 404, 418 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990), particularly where the consultant undertakes tasks that transcend the usual scope of a professional-client relationship. *See* 29 C.F.R. § 2509.75–5 (1990). However, we disagree with the implication of Pappas's argument, which is that consultants become fiduciaries when they perform professional functions in a tortious manner, regardless of what capacity they are acting in when their tortious deeds occur.

Plaintiff also argues that Hartt and Buck became fiduciaries when they failed to disclose the reasoning behind the actuarial assumptions and methodologies they adopted. This failure, Pappas argues, left him with no choice but to rely on the conclusions of the Plan's actuaries, circumscribing his freedom of action so much that the actuaries assumed effective control of Plan administration. Brief at 25. We are unconvinced by this argument as well. ERISA plan trustees hire actuaries because they lack the training to perform the required calculations themselves and because it would be inefficient for them to acquire it given the small amount of actuarial work they need to do to manage their plans.

Because actuaries exist, in other words, plan administrators do not need to become actuaries and can instead rely on the actuaries they retain. This does not mean, of course, that plan administrators may not question their actuary's conclusions. Some may choose to do so, to a greater or lesser degree. Plaintiff's argument, however, would effectively require actuaries to lead their clients through the methodologies, assumptions, and calculations underlying the conclusions they reach, step by tortuous step; actuaries who did not provide this level of tutelage would risk coming within ERISA's definition of a fiduciary, with the potential liability that entails. Some plan administrators may find this sort of relationship with their actuaries helpful, perhaps because they hope to avoid becoming the victims of the kind of mistakes alleged here. But we are reluctant to reshape the relationship between actuaries and their clients in this way, at least absent an unambiguous indication that Congress intended this result.

The district court correctly described plaintiff's complaint as alleging nothing more than that defendants "(negligently) perform[ed] their usual professional functions. They allege that they prepared government required reports (erroneously) and made actuarial calculations." Mem.Op. at 6. These allegations, even under the permissive standard applied at the motion to dismiss stage, *see Yeksigian v. Nappi*, 900 F.2d 101, 102 (7th Cir.1990), simply do not suggest that Hartt transcended the normal role of an actuary providing advice to an ERISA plan. They also do not suggest that in relying on Hartt's advice, Pappas ceded "discretionary control" or "discretionary authority" over the IIG Plan to the Plan's actuary. For these reasons the district court was correct to rule that Pappas's allegations failed to state a claim for breach of fiduciary duties under ERISA.

## IV. COUNT 4: ERISA REPORTING REQUIREMENTS

In addition to the claim for breach of fiduciary duties contained in Count 2 of his

complaint, Pappas alleges in Count 4 that, in submitting annual reports to the Internal Revenue Service as required under ERISA's reporting and disclosure provisions, ERISA §§ 101–111, 29 U.S.C. §§ 1021–1031, Hartt falsely represented that the reports were "complete and accurate," were based on the Plan's experience and "reasonable expectations" and represented their best estimates of "anticipated experience under the Plan." Complaint ¶ 37. While ERISA's civil enforcement provisions provide a cause of action for misstatements contained in reports filed with regulators, the only parties liable under these provisions are plan administrators and, under one provision, employers. *See* ERISA § 502(a)(4), (c)(1)–(3); 29 U.S.C. § 1132(a)(4), (c)(1)–(3). Recognizing that Hartt and Buck Consultants lie outside the ambit of these provisions, the district court accurately described this claim as "seek[ing] to create a private right of action based upon ERISA reporting requirements," Mem.Op. at 8, and dismissed it for failure to state a claim.

On appeal, Pappas argues that we should allow ERISA beneficiaries to sue professionals who assist plan administrators in the preparation of statutorily required reports and misrepresent the financial health of ERISA plans in these reports. He puts forward three theories in support of this contention: first, that ERISA's remedial purpose will be thwarted if courts do not imply a private cause of action against these professionals; second (and closely related), that we should create a cause of action against these professionals arising under federal common law; and third, that Hartt is liable for inducing Pappas, Feinman, or both to breach the fiduciary duties they owed to the Plan's beneficiaries by approving the excessive distribution to Feinman that left the Plan financially impaired. We address these arguments in turn.

## A. Implied Right of Action

■ Pappas first contends that the district court erred in declining to allow an implied right of action against non-fiduciaries who provide erroneous information to

the regulators charged with monitoring the financial health of ERISA plans. We think the district court was right to decline both of these invitations "to tamper with an enforcement scheme crafted with such evident care as the one in ERISA." *Massachusetts Mutual Life Ins. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985); *see Painters of Philadelphia*, 879 F.2d at 1152. Pappas points us to no evidence that Congress intended to allow recoveries from anyone other than administrators and employers beyond the assertion that ERISA was intended to protect beneficiaries. This statement, while true, does not rebut the strong presumption that the remedy he urges us to imply into ERISA's " 'comprehensive legislative scheme' " was " 'deliberately omitted' " by Congress. *Massachusetts Mutual Life*, 473 U.S. at 147, 105 S.Ct. at 3093 (quoting *Northwest Airlines v. Transport Workers*, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981)); *see Giardono v. Jones*, 867 F.2d 409, 413 (7th Cir.1989) ("[T]he statutory scheme of ERISA does not lend itself to judicial expansion of available remedies.").

As the Supreme Court observed in *Massachusetts Mutual Life*, 473 U.S. at 147, 105 S.Ct. at 3093, " '[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' " (quoting *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979)). As in *Massachusetts Mutual Life*, in deciding whether to imply a private right of action into ERISA, we look to the four-factor test set out in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), *see* 473 U.S. at 145, 105 S.Ct. at 3091–92. Like the plaintiff in *Massachusetts Mutual Life*, Pappas has satisfied the first of the four factors set out in *Cort:* as a plan beneficiary, he is a member " 'of the class for whose *especial* benefit the statute was enacted.' " *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088 (quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)). However, Pappas cannot satisfy the next three branches

of the *Cort* test. First, were we to create the cause of action he seeks, we would essentially supplant state-law malpractice claims against professionals who negligently prepare the reports ERISA requires. Thus, the federal cause of action he proposes "is ... one traditionally relegated to state law." *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088; *see Painters of Philadelphia*, 879 F.2d at 1152–53. Second, and even more damaging to Pappas's argument, is the fact that there is no "indication of legislative intent, explicit or implicit," *id.*, suggesting that Congress viewed the remedy Pappas asks us to create as a desirable one. We have already noted, *supra* at 539, that suits against non-administrators for violations of reporting requirements are not included among the mechanisms for civil enforcement set out in ERISA § 502(a) or (c). In *Massachusetts Mutual*, the Supreme Court found that Congress's silence concerning the private right of action the plaintiff in that case sought to assert to be "strong evidence" that Congress did not intend it to exist. 473 U.S. at 146, 105 S.Ct. at 3092. Likewise, the fact that Congress did not authorize suits against non-fiduciaries for breaches of reporting requirements is strong evidence that no such suits were intended by ERISA's drafters. Pappas introduces no evidence drawn from the language or legislative history of ERISA to persuade us to answer the central question of "whether Congress intended to create the private remedy asserted" in his favor. *Transamerica Mortgage Advisors*, 444 U.S. at 17, 100 S.Ct. at 246.

Turning to the third of the *Cort* factors, we recognize that allowing suits against negligent non-administrators who misrepresent the financial health of an ERISA plan in forms filed with regulators might give the actuaries and accountants who complete these documents an additional incentive to complete their reports with the degree of care expected of the reasonable professional. However, the interest ERISA beneficiaries have in competent plan consultants is already vindicated by the availability of state-law malpractice suits brought by beneficiaries who rely on misrepresented information contained in annual reports when the substance of these reports is disseminated to beneficiaries as required under ERISA. *See* ERISA § 105(c), 29 U.S.C. § 1025(c). Creating a federal private right of action would contribute little to the goals of plan financial integrity and informed beneficiaries that ERISA's notification and enforcement provisions were intended to attain.[1] It is thus difficult to conclude that the creation of a private right of action against professionals is any more "consistent with the underlying purposes" of ERISA than the existing remedy of state-law malpractice actions. *Cort*, 422 U.S. at 78, 95 S.Ct. at 2087–88. As in *Cort* itself, the private remedy proposed "would not aid the primary congressional goal." *Id.* at 84, 95 S.Ct. at 2090. Because Pappas has satisfied only one of the four *Cort* factors, and especially because he has failed to argue convincingly that Congress intended that the remedy he seeks be created, we conclude that the district court was correct in refusing to find an implied private right of action against negligent but nonfiduciary professionals who cause injury to ERISA plans.

### B. Federal Common Law

Pappas next argues that we should look to our power to fill the interstices of congressional enactments with federal common law to find a cause of action against Hartt and other non-administrators who make misrepresentations in ERISA annual reports. We disagree with this view of our limited power to add to ERISA's arsenal of civil enforcement devices. Speaking to the scope of the power to derive federal common law from statutory schemes such as ERISA, the Supreme Court observed in *Milwaukee v. Illinois*, 451 U.S. 304, 319,

---

1. We observe that some of the same factors that lead us to conclude that ERISA does not contain an implied right of action against non-administrators who misrepresent information contained in annual reports recently led the Third Circuit to the view that state-law claims for malpractice against professionals who provide advice to plans are not preempted by ERISA. *See Painters of Philadelphia*, 879 F.2d at 1153 n. 7.

101 S.Ct. 1784, 1793, 68 L.Ed.2d 114 (1981), that "[t]he establishment of ... a self-consciously comprehensive program by Congress ... strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." It is true that the Supreme Court has "held that the courts are to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987)); *see Fox Valley & Vicinity Const. Workers Pension Fund v. Brown,* 897 F.2d 275, 281 (7th Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990) ("When ERISA is silent on an issue, a federal court must fashion federal common law rules to govern ERISA suits."). Pappas's argument to the district court, however, did not concern "'rights and obligations'" under an ERISA plan; rather it concerned the distinct question of whether ERISA creates a remedy against parties other than plan administrators for violations of these "'rights and obligations.'"

■ The distinction between the power of federal courts to create a substantive federal common law of contracts and trusts under ERISA and our far more circumscribed power to augment ERISA's remedial provisions is supported by the Supreme Court's decision in *Pilot Life.* In that case, the Supreme Court noted the broad powers of the federal courts to create federal common law under ERISA, but observed that ERISA § 502(a), 29 U.S.C. § 1132, "set[s] forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement against the public interest in encouraging the formation of employee benefit plans," 481 U.S. at 54, 107 S.Ct. at 1556. The Court went on to state that "'[t]he six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'"

*Id.* (quoting *Massachusetts Mutual Life Ins.,* 473 U.S. at 146, 105 S.Ct. at 3092) (emphasis in original). As applicable to the facts here, § 1132 provides for suits against plan administrators for failure to comply with reporting requirements, but not against the professionals who assist administrators in preparing the reports. 29 U.S.C. § 1132(a)(4), (c)(1)–(3). We decline to create federal common law expanding these remedies to authorize suits under ERISA against persons who fall beyond the statute's reach.

### C. Inducement of Breach of Notification Requirements

■ The last of Pappas's attempts to breathe life into Count 4 of his complaint is his argument that defendants' misrepresentations induced Feinman and/or himself, the trustees of the IIG Plan, to breach the fiduciary obligations they owed to the Plan's beneficiaries. He alleges that defendants' false reports induced the Plan's trustees "to pay an excessive and discriminatory amount to Feinman, thereby leaving insufficient funds to meet the Plan's obligations to the remaining participants." Brief at 31. The district court rejected this claim on two grounds. The first was that Pappas had not alleged that a breach of fiduciary duties had occurred. The second was that the complaint failed to allege that the breach of fiduciary duties was the result of a conspiracy between Hartt and one or both of the trustees, which the district court, relying on our decision in *Thornton v. Evans,* 692 F.2d 1064 (7th Cir.1982), reasoned was an essential element of a claim that a defendant induced an ERISA trustee to breach fiduciary duties.

In *Thornton,* this Circuit recognized that an ERISA beneficiary could maintain a cause of action against a non-fiduciary who had conspired with an ERISA fiduciary to breach fiduciary duties owed to the beneficiary. *See Thornton,* 692 F.2d at 1078; *see also Whitfield v. Lindemann,* 853 F.2d 1298, 1303 (5th Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 641–42 (W.D.Wis.1979).

*But see Nieto v. Ecker*, 845 F.2d 868, 871 (9th Cir.1988) (allowing claims against "non-fiduciaries insofar as they abetted fiduciaries in their breaches of duty" "depart[s] from plain meaning of the [ERISA] statute.").[2]

We conclude that the district court was right to decide that Pappas had not pleaded the elements of a cause of action under the theory that he and Feinman had been induced to breach their fiduciary obligations by Hartt.[3] First, Pappas did not allege in his complaint that Hartt *knowingly* induced him to breach his fiduciary duties by making the excessive distribution to Feinman. All he alleges is that Hartt rendered incorrect advice and made misleading reports. Complaint ¶ 35. Past cases involving the inducement of an ERISA trustee to breach fiduciary duties, however, require more than innocent but careless errors on the part of the non-fiduciary defendant. In *Thornton*, we observed that "[a] necessary element of plaintiff's claims against the non-fiduciary defendants is that they conspired with the fiduciaries...." 692 F.2d at 1078 n. 34. Pappas has not alleged that a conspiracy existed between Feinman and Hartt to dupe Pappas, the co-trustee, into approving the excessive payment to Feinman. Other courts describe the requisite involvement by the non-fiduciary as "knowingly participat[ing] with a fiduciary in a breach of fiduciary trust." *Nieto v. Ecker*, 845 F.2d 868, 874 (Wiggins, J., concurring); *see also Whitfield*, 853 F.2d at 1298 ("[A]lthough Klepak was not a statutory fiduciary, he was, as the district court held, jointly liable with Lindemann as a nonfiduciary who knowingly participated in a breach of trust.") (citations omitted); *Lowen v. Tower Asset Management*, 829 F.2d 1209, 1220 (2d Cir.1987) ("[P]arties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries."). Pappas has not alleged Hartt's knowing inducement ei-

ther. Because the tortious mistakes that Pappas alleges are insufficient to state a claim for inducement by a non-fiduciary of a breach of fiduciary duties, the district court was right to reject this alternative theory supporting Count 4 of Pappas's complaint.

## V. CONCLUSION

For the foregoing reasons, the decision of the district court to dismiss counts 2 and 4 of plaintiff Pappas's complaint for failure to state a claim and to dismiss plaintiff's pendent state-law claims for want of subject matter jurisdiction is

Affirmed.

---

**2.** This portion of the Ninth Circuit's *Nieto* opinion was criticized in Judge Wiggins' concurrence in that case. *See* 845 F.2d at 874–76.

**3.** We do not reach the question of whether Pappas, himself a co-trustee of the IIG Plan before

its termination and at the time of the distribution to Feinman, would be an appropriate party to assert a claim that the former trustees, or one of them, were induced to make the excessive distribution.