**In re IRON WORKERS LOCAL 25 PENSION FUND.**

Case Nos. 04–cv–40243, 07–cv–12368.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 29, 2011.

Sharon S. Almonrode, Michael J. Asher, Sullivan, Ward, Southfield, MI, for Iron Workers Local 25 Pension Fund.

Eugene Driker, Morley Witus, Sharon M. Woods, Matthew J. Bredeweg, Barris,

Sott, Detroit, MI, Thomas S. Gigot, Groom Law Group, Washington, DC, for Defendant.

John A. Streby, Flint, MI, Jenice C. Mitchell, Foley & Lardner, Detroit, MI, for Interested Parties.

## MEMORANDUM ORDER FOLLOWING BENCH TRIAL

STEPHEN J. MURPHY, III, District Judge.

In January 2007, Watson Wyatt & Company ("Watson Wyatt") agreed in principle to settle claims brought by the Iron Workers Local No. 25 Pension Fund ("Fund") and its board of trustees. Pursuant to the settlement, Watson Wyatt agreed to pay the Fund $110 million in exchange for a release of all liability and dismissal of all claims with prejudice. Under the fee agreement in place between the Fund and its counsel—Anthony and Michael Asher and their law firm, Sullivan, Ward, Asher & Patton, P.C. (collectively "Sullivan Ward")—counsel was entitled to receive approximately $36 million of the $110 million settlement.

In April 2007, at a hearing held in connection with the settlement, George Young, one of the Fund's trustees at the time, challenged the propriety of the contingency fee. He alleged that the fee was excessive and that the fee agreement had been created while Sullivan Ward was subject to a conflict of interest. Young sought to intervene in the action to prevent payment of the fee. After the hearing, and with consent of the parties, the Court ordered the fee portion of the $110 million settlement transferred to a separate savings account at Sullivan Ward's bank, and the funds placed in short-term treasury notes, until the Court had an opportunity to rule on Young's motion to intervene.

Shortly thereafter, in May 2007, Young, joined by Fund participant Harvey Weglarz and Fund beneficiary William Chakur, ("Plaintiffs"), filed a separate lawsuit against 1) Sullivan Ward; and 2) the Fund trustees at the time of the relevant decisions, James Hamric, James Edwards, Patrick Gleason, Steven Gulick, D. James Walker, Art Ellul, and J. Michael Rogers ("Trustees"). Plaintiffs make three allegations: 1) Sullivan Ward breached its fiduciary duties under ERISA; 2) the Trustees breached their fiduciary duties under ERISA; and 3) the Trustees caused the plan to engage in a transaction with Sullivan Ward that they knew was prohibited under ERISA.[1]

After resolving the parties' pre-trial motions, see Opinion and Order of March 31, 2011 (docket no. 430), the Court conducted a ten-day bench trial between May 17, 2011, and June 8, 2011. Extensive testimony and documentary evidence was received by the Court during trial. (The final pretrial order alone runs 123 pages). This order sets forth the Court's findings of fact and conclusions of law pursuant to Civil Rule 52(a)(1).[2]

---

1. The Court later dismissed additional claims against Sullivan Ward for breach of contract, legal malpractice, and breach of common law fiduciary duty. See Opinion and Order of Nov. 4, 2009, 2009 WL 3698562 (docket no. 322).

2. At the close of Plaintiffs' case-in-chief, counsel for the Trustees orally moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), but the motion was never argued, and the Court indicated its preference to hear all of the evidence before making findings. Counsel later renewed his motion in his closing argument and asked the Court to rule in the Trustees' favor based solely on the evidence offered in Plaintiffs' case-in-chief. The granting of such relief is discretionary, and a court has full discretion to defer the entry of judgment until after hearing all of the evidence. Fed.R.Civ.P. 52(c); see Caterpillar Fin. Servs. Corp. v. Tincher (In re Tincher), 181 F.3d 104;1999 WL 266261, at *3 (6th Cir. Apr. 21, 1999) (unpublished table

## FINDINGS OF FACT[3]

### The Fund and its Trustees

1. The Fund is a pension fund governed by ERISA that has approximately 5,000 participants and beneficiaries. Its headquarters are located in Novi, Michigan. The Fund receives contributions from its members' employers. Upon retirement, qualifying members receive pension benefits from the Fund.

2. As of May 2004, approximately 400 employers contributed to the Fund pursuant to the terms of the collective bargaining agreements between the employers and the Iron Workers Local No. 25 Union ("Union"). Contributions are submitted monthly, are pooled, and are later invested collectively. Proceeds from the investments are used to pay future pension benefits.

3. The Fund is governed by a six-person Board of Trustees. The Union elects three (the "Union Trustees") and the Great Lakes Fabricators & Erectors Association elects three (the "Employer Trustees").

4. Fund trustees receive no compensation for their service, but instead serve as volunteers. They are reimbursed for expenses they incur while conducting Fund business.

5. The Fund is governed pursuant to the Iron Workers Local 25 Pension Fund Declaration and Agreement of Trust of January 1, 2002, as amended ("Trust Agreement"). The Trust Agreement establishes and defines the powers of the trustees.

6. According to § 5.2 of the Trust Agreement, the Trustees sit as a Joint Board, and are permitted to act on the Fund's behalf solely through the Board.

7. Section 1.5 of the Trust Agreement provides that the Joint Board of Trustees is "vested with the power to interpret this Trust Agreement and any Plan established thereunder, and its interpretation, if not in conflict with any applicable law or government regulation, shall be final and conclusive." Moreover, "[t]he Joint Board of Trustees ... have the full discretionary authority to ... construe the terms of the Trust Agreement and the Plan, and any regulations, policies or rules issued thereunder."

8. Similarly, § 5.3(o) of the Trust Agreement permits the Joint Board to "[i]nterpret the Trust Agreement and any plan established thereunder and determine all questions arising in the administration, interpretation and application of such documents. All such determinations shall be conclusive and binding."

9. Section 5.3(l) permits the Joint Board to "[d]o all other acts, and take any and all other action, whether or not expressly authorized herein, which the Joint Board may deem necessary or proper for the protection of the property held hereunder, or to effectuate the purposes of this fund which is in compliance with applicable law."

10. Specifically, the Joint Board is authorized by § 5.3(f) to "employ and retain ... legal assistants or employees as in its discretion the Joint Board may deem necessary or appropriate" and may "pay their reasonable expenses and compensation out of the Fund."

---

decision); *accord Gaffney v. Riverboat Servs. of Ind., Inc.,* 451 F.3d 424, 451 n. 29 (7th Cir.2006). The Court prefers to consider all of the evidence in making these findings. The Trustees' motion, while timely and proper, is therefore denied.

**3.** The facts found here are based on the voluminous exhibits admitted, as well as the Court's recollection and notes from the trial. The Court has not considered transcripts from the trial.

11. Section 5.3(d) authorizes the Joint Board to "[c]ompromise, arbitrate, settle, adjust or release any law suit [sic] or legal proceeding, claim, debt, damage or undertaking due or owing from or to the Fund on such terms and conditions as the Joint Board may deem advisable."

12. A quorum consisting of at least two Union Trustees and two Employer Trustees is required to transact business. Trust Agreement § 6.8.

13. Actions or decisions of the Joint Board must be made by a majority of the votes cast by the trustees attending a meeting and all meetings must be "conducted in accordance with *Robert's Rules of Order*, Newly Revised, unless waived by the Trustees present or there is a conflict between such procedures and the terms of th[e] Agreement." *Id.* § 6.9.

14. A written record must be kept "of all business transacted and of all matters upon which voting shall have occurred", and a copy of the record must be furnished to each trustee. *Id.* § 6.7.

15. In the summer of 2003, the Joint Board consisted of the following members: Union Trustees Patrick Gleason (Chairman), James Hamric, and Art Ellul; and Employer Trustees James Edwards, D. James Walker, Jr., and J. Michael Rogers (Secretary). In October 2005, Steven Gulick replaced Patrick Gleason as a Union Trustee, and James Hamric became Chairman. These seven trustees are defendants in this action.

16. The Trustees are sophisticated business people, several of whom owned and operated their own businesses in the steel industry before becoming trustees.

17. The Trustees received training regarding their fiduciary duties by attending classes sponsored by the International Foundation of Employee Benefit Plans, and presentations offered by the Fund's counsel, in addition to any training received through prior experience serving as a trustee for other organizations.

18. When the Trustees hired service providers, they did not always solicit bids from various firms before making a decision. In general, they did not solicit bids when a firm had provided services to the Fund before and the Trustees believed that it had provided excellent services.

**The Law Firm and Fund Counsel**

19. Sullivan, Ward, Asher & Patton, P.C., is a law firm incorporated under the laws of the State of Michigan as a professional corporation. Its principal office is located in Southfield, Michigan. Anthony and Michael Asher (father and son) are shareholders of Sullivan Ward and are licensed to practice law in Michigan.

20. Initially, the law firm practiced primarily in the field of professional malpractice. When Anthony Asher joined the firm, he brought with him a labor union practice. Currently, the firm represents approximately thirty to forty union funds, many of which are multi-employer funds.

21. Anthony Asher is the firm's CEO and has served as counsel for the Fund for more than 20 years. Michael Asher also served as counsel for the Fund during that time.

22. For their services to the Fund during the time period in question, the Ashers were paid a fee of $150 per hour.

23. As Fund counsel, the Ashers drafted plan documents and amendments to the Trust Agreement; represented the Fund before Internal Revenue Service and Department of Labor audits and investigations; assisted the trustees in negotiating contracts with Fund service providers, such as money managers and investment consultants; sought to compel employer compliance with Fund contribution promises made in CBAs; counseled the trustees

on understanding and meeting their legal obligations under ERISA and other laws applicable to pension funds; communicated recent updates in law to the trustees; educated the trustees on the exercise of their duties under ERISA; and litigated matters on behalf of the Fund. The Ashers sought to provide a full range of legal services to the Fund insofar as those services were within the firm's range of competence.

24. As Fund counsel, the Ashers provided legal advice to the Trustees when requested, but did not offer unsolicited advice or opinions on every issue that came before the Trustees. The Trustees considered the advice, but did not always pursue the recommended course of action. When the Trustees and Fund counsel disagreed on matters, the Trustees made a decision based on their individual and independent judgments.[4]

25. Because the Ashers had good relationships with the Fund trustees over a long period of time and understood well how the Fund operated, the Trustees felt confident that the opinions and advice the Ashers provided were, on the whole, sound and reliable. Accordingly, they followed the advice of counsel many times.

26. Board meetings were attended by the Trustees, the Fund's assistant administrator Dennis Kramer, and Fund participants. One or both of the Ashers also attended every Board meeting.

27. Dennis Kramer recorded the minutes of Board meetings. At the beginning of each meeting, the Trustees voted to approve the prior meeting's minutes.

28. The Trustees sometimes conducted Fund business in executive session, during which all but the Trustees and Fund counsel were excused. The Trustees believed they could speak more candidly in executive session. Matters the Trustees wished to keep confidential—for reasons including, e.g., to protect the attorney-client privilege or to discuss litigation strategy—were discussed only in executive session.

29. The specifics of discussions in executive session were not included in the meeting minutes. Trustees were to inform Kramer of any vote taken in executive session, for inclusion in the minutes. Not every vote, however, found its way into the minutes.

30. The Trustees believed the Trust Agreement gave them the authority to conduct executive sessions off the record. Specifically, the Trustees interpreted the document to permit them to conduct meetings in accordance with *Robert's Rules of Order*, which the Trustees believed sanctioned executive sessions. Also, the Trustees read section 5.3(*l* ) of the Trust Agreement—allowing the trustees to "[d]o all other acts, and take any and all other action ... which the Joint Board may deem necessary or proper" for the protection of the Fund—to permit the executive sessions. They believed discussing certain confidential matters in executive session was in the best interest of the Fund.

## Watson Wyatt's Involvement with the Fund

31. Beginning in 1982 and continuing until May 7, 2003, the Trustees retained Watson Wyatt to provide actuarial services for the Fund.

32. Watson Wyatt reported annually on the health of the Fund in Actual Variation Reports ("AVRs"), which contained complex calculations demonstrating how the

4. On this point, the Court does not credit the testimony of former Employer Trustee Bart Carrigan, who testified that the Ashers were the "dominant force" at Board meetings, and exerted undue influence or control over the Trustees to the point that the Ashers served as de facto trustees for the Fund.

actuary arrived at its conclusions regarding the Fund's financial health.

33. The Trustees relied on Watson Wyatt's actuarial services and its interpretation of the AVRs each and every year to determine the financial condition of the Fund.

34. Because pension benefits are paid far out into the future, actuaries must use a complex set of mathematical algorithms, combined with experience and judgment, to project the cost of future benefits. They must project future benefit obligations using actuarial assumptions, current plan participant data, and the plan's benefit formula. An actuarial assumption is an estimate of a future event that has a direct financial effect on a pension plan. The actuary must make both economic and demographic assumptions. Economic assumptions include those regarding interest rates, salary increases, inflation, and investment markets. Demographic assumptions are those made about a group's make-up, expected behavior, and life expectancy. Once the actuary selects the assumptions, he or she then projects the actuarial cost through another series of complex mathematical calculations.

35. Actuaries must take special care and be conservative when providing actuarial advice to multi-employer pension plans, such as the Fund, because of the additional future events the actuary cannot identify or measure.

36. Until September 20, 2002, Watson Wyatt consistently advised the Trustees that the Fund had sufficient assets to cover retiree benefits. Watson Wyatt told the Trustees that the Fund had sufficient assets to *increase* retiree benefits without also increasing the employer contribution amounts or decreasing worker recognition

rates for hours worked in 1997, 1999, and 2000.[5]

37. On September 20, 2002, after years of positive reports regarding the Fund's health, Watson Wyatt advised Trustees that the Fund had a funding shortfall of several hundred million dollars, requiring immediate cut-backs and a 25% increase in employer contributions before May 1, 2004, to avoid severe consequences.

38. The Trustees were surprised and devastated by the news. They referred to this meeting as the one "where the bomb was dropped."

39. Around the same time, Watson Wyatt attempted to renegotiate its service agreement with the Fund to limit its potential liability for professional negligence. The Trustees did not accept the terms of the proposal. In May 2003, Watson Wyatt terminated its relationship with the Fund.

40. Shortly after the September 2002 meeting, the Trustees retained AON Consulting ("AON"), another actuarial firm, to provide a second opinion regarding the Fund's health. The Trustees did not solicit bids from other actuarial firms before hiring AON.

41. After its review of the Fund's finances, AON concluded that the Fund was in worse condition than originally thought, and that Watson Wyatt's recommendations to cure the shortfall were not aggressive enough. More cut-backs and higher increases in employer contributions were required to reverse course. AON confirmed that Watson Wyatt had made no errors in its calculations.

### Remedial Measures

42. The Trustees recognized that they must take remedial measures to avoid the

---

**5.** No allegations of wrongdoing were ever proved because the case was settled prior to trial.

significant consequences of a funding shortfall.

43. Specifically, if there was an acute deficit in funding, the Pension Benefit Guarantee Corporation ("PBGC") would take over the Fund. In that event, retirees future benefits would be significantly reduced. The Trustees desired to avoid that event at all costs.

44. In addition, under federal law, a funding deficiency could trigger withdrawal liability. Withdrawal liability is the liability that contributing employers face if they withdraw from a pension plan when the plan is underfunded. An employer that withdraws from a multi-employer pension fund is liable for that portion of unfunded liability that is attributable to the employer under formulas provided by federal statutes. The employer must continue making payments to the plan to help complete funding benefits. Depending on the extent of the unfunded liability, the amount of withdrawal liability can be substantial. The Trustees feared that if employers withdrew from the Fund, their withdrawal liability could bankrupt them, leading to further harm to the Fund and its participants.

45. To respond to these possibilities, the Trustees considered a number of measures. Their immediate goal was to "save" the Fund, in an environment where the shrinking construction industry was resulting in fewer contributions. Measures considered included: increasing employer contributions, changing eligibility requirements, altering the manner in which years of service were credited to participants (reducing recognition rates), reducing benefits, and many more.

46. The Trustees gave each measure careful consideration because each one would affect retirees, active employees, and contractors. In addition, some remedial measures, such as reducing supple-mental benefits to retirees, required IRS approval prior to implementation.

47. The Trustees brought their concerns to representatives in the United States Congress in an effort to amend the federal Pension Protection Act to allow for changes in benefits.

48. The Trustees also sought the advice of outside counsel. In May 2005, the Trustees hired the Washington, D.C. law firm of O'Donoghue & O'Donoghue ("O'Donoghue") to undertake a comprehensive and independent review of the Fund's financial situation and the Trustees' remedial efforts, including the *Watson Wyatt* litigation discussed below.

49. Sullivan Ward advised the Trustees and O'Donoghue that a comprehensive review of the litigation would be drawn-out and costly. The Trustees wanted a quick turnaround on the review, so they narrowed its scope to exclude the litigation. The Trustees did, however, give a copy of the contingency fee agreement at issue in this case to O'Donoghue for its review.

50. O'Donoghue advised the Trustees that they had taken appropriate remedial measures. O'Donoghue did not suggest that the fee agreement was a prohibited transaction or an imprudent arrangement for litigation services.

**The Beginning of the *Watson Wyatt* Litigation**

51. At a Board meeting on August 27, 2003, the Trustees instructed Anthony Asher to investigate whether an action could be brought against Watson Wyatt for its advice to the Fund. The Fund paid Sullivan Ward $150 per hour, its hourly rate for Fund work at that time, for these services.

52. Sullivan Ward's investigation led it to believe that a lawsuit against Watson Wyatt would be difficult for many reasons.

53. First, after nationwide research on the issue, Sullivan Ward had found only two successful actuarial malpractice cases. Neither case was precisely on-point. Each involved admitted calculation errors by the actuarial firm, making damages the only issue in dispute. The Fund's lawsuit against Watson Wyatt, in contrast, was not premised on alleged calculation errors. As AON had confirmed, Watson Wyatt's calculations had been correct. Its alleged error lay in the modeling and advice it had rendered to the Fund.

54. Michael Asher contacted the attorneys in each of the two successful cases. In one of the two cases, *Farnham v. Watson Wyatt & Co.*, No. 3:99–CV–00792 (D.Conn.), a pension fund receiving services from Watson Wyatt had obtained a jury verdict adverse to Watson Wyatt in the sum of $37 million. Asher contacted the attorneys that represented the plaintiff pension fund (Michael Gertzman of Paul, Weiss, Rifkind, Wharton & Garrison in New York City) to learn about the case and about Watson Wyatt as an opponent. In addition, Asher ordered the entire case file, including the trial transcript, motions, and expert reports. In the other case, Latham & Watkins had obtained a large settlement against a different actuarial firm. Asher contacted Latham & Watkins about their representation of the plaintiff.

55. Second, Sullivan Ward believed that a suit against Watson Wyatt would be difficult because it knew that Watson Wyatt had sufficient resources to vigorously oppose the lawsuit. Watson Wyatt could afford to retain the best experts, and the best lawyers.

56. Third, no precedent existed for the type of case the Trustees were considering. There was no established standard of care for the type of actuarial advice Watson Wyatt had rendered. Sullivan Ward would have to create one on which to base its case. Convincing a judge to accept the standard might be difficult.[6]

57. Fourth, as discussed above, AON's review had confirmed that Watson Wyatt had not made any mathematical errors.

58. Finally, the litigation might be unsuccessful because Watson Wyatt had a seemingly viable defense that a decline in the construction industry and a general slump in the economy were the proximate causes of the under-funding, rather than any negligence on its part.

59. On the other hand, Sullivan Ward consulted with two actuarial experts who offered preliminary opinions that Watson Wyatt had been negligent.

60. Despite the many difficulties, Asher's investigation led Sullivan Ward to believe that a lawsuit against Watson Wyatt would not be meritless, but had a chance of succeeding, though the chances were slim.

61. Between the August 27, 2003 Board meeting, when the Trustees instructed Asher to investigate the potential suit, and

---

6. In May 2008, the Fifth Circuit, in *Bd. of Trs. New Orleans Employers Int'l Longshoremen's Ass'n, AFL–CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506 (5th Cir.2008), declined to recognize the type of actuarial duty asserted by the Fund against Watson Wyatt. It found the district court's factual finding on the matter not clearly erroneous, agreeing that:

Once the actuary provided the Board with an accurate actuarial cost projection and informed the Board of the recent market decline, she met her duty under Section 5.8

[of the Actuarial Standard of Practice No. 4]. The Plaintiffs have no support for their claim that Section 5.8 also requires an actuary to inform the Board of the actuary's personal opinion regarding a proposed benefit. In light of the plain language of Section 5.8 and the record of [the actuary's] conduct, the district court did not clearly err in ruling that [the actuary] properly assisted the Plan in making its decision about whether to adopt the new benefits. *Id.* at 512.

May 2004, the Trustees and the Ashers many times discussed the potential for litigation against Watson Wyatt.

62. The Ashers told the Trustees about the results of their investigation, including the cases they had found, their discussions with the attorney in the *Farnham* case, and the preliminary opinions of the two actuarial experts they had contacted.

63. The Ashers advised the Trustees that a lawsuit would be costly, would take a long time, and would involve at least one appeal. There were many hurdles to surmount, including the application of the discovery rule, establishing an applicable standard of care, Watson Wyatt's access to the best lawyers and experts, and Watson Wyatt's potential defenses on proximate causation.

64. Ultimately, the Ashers offered their opinion that the case would be difficult, but that "if it hit, it would hit big."

65. The Trustees considered the results of Sullivan Ward's investigation. Some Trustees also researched the matter on their own. James Edwards, for example, conducted internet research and discussed the potential litigation with friends who sat on other multi-employer pension fund boards. He found no support for such a lawsuit. Art Ellul reviewed a report published by the International Foundation of Pension Benefit Plans that indicated that the outcome of similar lawsuits against actuaries was not good. Edwards and Ellul shared the results of their investigation with the other Trustees.

66. After a thorough review of the information before the Trustees and consideration of the pros and cons of the case, the Trustees agreed that a lawsuit against Watson Wyatt was in the best interests of the Fund.

67. The Trustees chose Sullivan Ward to represent the Fund in this matter. They did not solicit bids for the litigation or interview any other law firms. The Trustees were aware that other law firms could handle the case, but preferred to retain Sullivan Ward for several reasons.

68. First, the Fund had an established working relationship with Sullivan Ward, which it did not have with either of the firms that had been successful in the actuarial malpractice cases discussed above. In addition, because those cases did not involve multi-employer funds and raised different legal and factual issues, the Trustees believed that those firms' experience litigating the cases would not necessarily present any special advantage to the Fund in this case. The Trustees also knew that retaining one of those firms would be significantly more expensive than retaining Sullivan Ward. As larger, national firms, they would likely charge at least three times as much as Sullivan Ward. Moreover, because they would be new to the case, they would require billed time just to get up to speed on the issues. Finally, as national firms, they would be required to retain local counsel to undertake the representation.

69. In contrast, by retaining Sullivan Ward, the Trustees could avoid spending time and money interviewing other firms. Sullivan Ward had satisfactorily served as counsel to the Fund for more than 20 years. The Trustees knew that Sullivan Ward had extensive experience in both professional malpractice litigation and with multi-employer pension funds. Moreover, having served as counsel to the Fund before and after Watson Wyatt's alleged negligence, Sullivan Ward was familiar with the facts underlying the case, and therefore would not bill the Fund for time spent getting up to speed on the issues. In short, the Fund required immediate action, and Sullivan Ward was in a position to act quickly.

70. The Trustees hoped to fund the lawsuit with as little of the Fund's assets as possible. By the time the Trustees decided to file a lawsuit, they had already implemented many of the benefit-cutting remedial measures suggested by AON, but the Fund was still under-funded. Fund members were upset that increased contributions were being used to cover past obligations, not future benefits.

71. Sullivan Ward offered to take the case on an hourly-fee basis. The Trustees, however, knew that the "bleeding" of assets had to stop, and that paying an hourly rate for litigation services in a case that might drag on for years would not promote that result.

72. After discussion, the Trustees decided that a contingency fee agreement was the only acceptable fee arrangement. Such an agreement would align Sullivan Ward's interests with those of the Fund, and would not place at risk a significant portion of Fund assets.

73. Although the specifics of the arrangement had not yet been finalized and approved, on April 14, 2004, Michael Asher filed an action against Watson Wyatt in federal court. *See Iron Workers' Local 25 Pension Fund v. Watson Wyatt & Co.*, No. 04–40109 (E.D.Mich.). Anthony Asher had authorized Michael to file the April 14 action under the belief that he had the tacit authorization of the Trustees, even though no formal vote had taken place. Anthony felt that the Trustees had been pushing to have the lawsuit filed. He had Michael file it before the next Board meeting so he could tell the Trustees the lawsuit was underway, as they had requested. Within a month the April 14 action was dismissed for lack of subject-matter jurisdiction.

74. Meanwhile, between September 2003 and May 2004, discussions about the lawsuit and the contingency agreement had continued. As of May 2004, no agreement had been reached.

75. At the May 6, 2004 Board meeting, based on parameters he had received from Sullivan Ward's management committee, Anthony Asher proposed a fee agreement to the Trustees during executive session. Asher proposed a hybrid arrangement whereby the firm would charge an hourly rate of $150 for partners until the fees reached $500,000, at which point, the Fund would no longer pay an hourly rate, and instead would pay the firm 1/3 of any net recovery (not including expenses), less the $500,000 already paid. The hybrid arrangement would reduce the cost of representation in the event of an early settlement or protracted litigation. If the case settled early, the proposed hybrid fee arrangement would permit the Trustees to keep the entire recovery amount, requiring them only to pay Sullivan Ward's hourly rate. If the case dragged on for years, as the Trustees expected, the Fund would not have committed extensive Fund assets to a lawsuit it might lose.

76. Asher also advised the Trustees that all expenses would have to be paid by the Fund, and could be in the range of $1 million to $1.5 million, primarily because of the need for extensive expert opinions from professionals at the top of their respective fields.

77. The Trustees preferred the hybrid arrangement, but thought that a $500,000 threshold was too high. Thus, the Trustees requested a $250,000 threshold instead, and Asher agreed. The Trustees unanimously agreed to accept Sullivan Ward's offer.

78. Because the discussion was held in executive session, records of it are not included in the meeting's minutes, which state simply that "[a]n Executive Session of the Joint Boards was called at 2:45 PM to discuss the Watson Wyatt litigation and

agree on retainer language." The Trustees and the Ashers testified unanimously, however, that an agreement was reached at the executive session.

79. The Trustees did not consider hiring independent counsel to help them negotiate the agreement with Sullivan Ward. All of the Employer Trustees at the time—Edwards, Rogers, and Walker—had experience negotiating fee agreements. The Trustees were also aware that the Union had lawyers versed in benefit issues who could assist with the negotiation, if needed.

80. The Fund was operating without the assistance of Fund counsel when it decided to file the action using Sullivan Ward. The Trustees were aware that when Anthony Asher was negotiating the fee arrangement, he was acting as a service provider, not as Fund counsel. Specifically, Walker reminded the other trustees that they were "on their own" in the matter. Moreover, Anthony Asher never advised the Trustees in his capacity as Fund counsel that they should hire Sullivan Ward to litigate the action under the hybrid fee arrangement, nor did he advise the Trustees that they would be in compliance with their duty to act prudently were the Fund to hire Sullivan Ward.

81. In executive session at the November 11, 2004 Board meeting, the Board confirmed the May 6, 2004 resolution regarding the fee agreement. Shortly thereafter, Anthony Asher sent a written document memorializing the agreement to the Trustees for signature. The proposed agreement stated that it "is effective retroactively to services performed on this matter by the Firm beginning May 2004."

82. With authorization from the entire Board, Chairman Gleason and Secretary Hamric signed the agreement during the January 20, 2005 Board meeting.

83. The legal services agreement is straight-forward and all parties understood its provisions. The document re-flects the parties' understanding from the May 6, 2004 Board meeting. Specifically, the Fund agreed to pay Sullivan Ward's hourly rate ($150 for partners; $125 for associates; $55 for paralegals) until the fees reached $250,000. At that point—after approximately 1,666 hours of work—the Fund would stop paying an hourly fee. In the event of any recovery for the Fund, Sullivan Ward would receive 1/3 of the net recovery (total recovery minus all expenses incurred), less the $250,000 it had already received on an hourly basis. The Fund would pay all the expenses. Sullivan Ward's percentage of the total recovery would not increase with trial or an appeal. Nor did the agreement permit Sullivan Ward to withdraw or refuse to take an appeal if the Fund lost in the district court. Sullivan Ward committed to taking the case wherever it went, good or bad.

84. The Trustees believed that the agreement was in the best interests of the Fund's participants because it reduced the risks of litigation. If the lawsuit resulted in no recovery, the Fund would only have paid $250,000.

85. Had Sullivan Ward taken the case solely on an hourly basis, its partners likely would have charged $250–$300 per hour, rather than $150 per hour.

86. On July 6, 2004, Sullivan Ward filed a lawsuit in federal district court against Watson Wyatt on behalf of the Fund and the Trustees. *See Iron Workers Local No. 25 Pension Fund v. Watson Wyatt & Co.*, No. 04–cv–40243 (E.D.Mich.). The case was assigned to Judge Paul V. Gadola.

## The Progress of the *Watson Wyatt* Litigation

87. After filing the case, Sullivan Ward appointed Sharon Almonrode as lead trial counsel. Almonrode had extensive experience at that point in her career, having practiced in litigation for 25 years at the

time. Almonrode had never first-chaired an action, but she had second-chaired many cases. This was the first time Almonrode had litigated an actuarial malpractice action, but she felt comfortable handling the matter. The case was also staffed with a legal assistant, a fully-dedicated paralegal, one associate, and Michael Asher. At times, the assistance of other attorneys in the firm was requested on discrete assignments. Almonrode worked on the case incessantly for nearly three years. She put the case above everything else, and was unable to perform work on any other case.

88. Watson Wyatt hired the law firm of Barris, Sott, Denn & Driker, a well-established and respected law firm in the Detroit Metropolitan area. Morely Witus was lead counsel for Watson Wyatt. This was the first time he had litigated an actuarial malpractice action, but he too felt comfortable handling the action.

89. The litigation was hard-fought. The Fund asserted claims of professional negligence, misrepresentation, and fraud, dating back to 1997. The Fund claimed that Watson Wyatt failed to properly and fully inform the Fund of the implications of the numbers in its actuarial valuations. The lawsuit challenged not only the actuarial tools used, but also the actuary's obligation as a professional advisor to fully, clearly, and timely communicate the status and real-world meanings of its findings. No court had ever determined whether an actuary had a duty to communicate this type information to its clients. The lawsuit did not involve any admissions of liability, or concrete and identifiable calculation or computer errors.

90. Watson Wyatt denied all liability. It would defend the case by arguing that the shortfalls were attributable to: a) the events of September 11, 2001 and the decline of the economy generally; b) three poor years in the equity market, the worst since the Great Depression; c) a downturn in the construction industry in southwest Michigan; d) diminished fund contributions caused by a significant decline in manhours; e) the Trustees' decisions to improve benefits despite alleged awareness that the industry was having difficulties; and f) Sullivan Ward's failure to advise the Trustees that the Fund could not afford to make the benefit improvements.

91. With respect to the last argument—that Sullivan Ward was at fault for the underfunding—Watson Wyatt did not file a third-party claim against Sullivan Ward for contribution. Nor did Watson Wyatt file a notice of non-party fault under Mich. Ct. R. 2.112(K), a prerequisite to arguing a non-party's fault to a jury in a tort action. Witus testified that he did not file the notice of non-party fault because the Michigan Court Rules do not apply in federal court as a result of the *Erie* Doctrine.[7]

92. Early in the case, before one of Watson Wyatt's experts (Marc Gertner) opined in his Rule 26 expert report that Sullivan Ward's conduct was a proximate cause of the harm to the Fund, Sullivan Ward attorney Gerard Andree raised internally the prospect that Sullivan Ward might face a conflict of interest.

93. Andree suggested that Sullivan Ward could be a potential defendant in the action because of advice rendered to the Trustees regarding the benefit improvements. Almonrode and the Ashers did not agree with Andree that this posed a conflict of interest because they thought Sullivan

---

7. One court has concluded that Mich. Ct. R. 2.112(K) is "part and parcel of Michigan's substantive tort law," and thus applies in federal court actions predicated on diversity jurisdiction. *See Greenwich Ins. Co. v. Hogan,* 351 F.Supp.2d 736, 739 (W.D.Mich.2004). The Court is not bound by this decision and finds no need to reach the question.

Ward had no duty to interpret or explain the significance of the AVRs.

94. Andree also suggested that even if Sullivan Ward could not be named as a defendant, the Ashers might still be potential witnesses in the case. Again, Almonrode disagreed, arguing that even if the Ashers were potential witnesses, rendering them unable to serve as counsel pursuant to Rule 3.7 of the Michigan Rules of Professional Conduct, Almonrode could still represent the Fund herself.

95. The Trustees did not know that these issues had been raised and vetted within the firm.

96. Sullivan Ward expended nearly 13,000 hours and reviewed nearly one million pages of documents during the litigation. Almonrode took or defended 30 depositions across the country, filed or opposed numerous pretrial motions, and undertook an extensive search for experts in the fields of actuarial science, economics, investments, trusteeship, and law. Two hundred experts were contacted and many were personally interviewed. The firm dedicated an entire floor in its office to storing and organizing documents related to the litigation.

97. One potentially problematic issue in the case was the application of Michigan's three-year statute of limitations to negligence claims, the Fund's primary claims in the suit.[8] The Trustees had made the majority of their benefit improvements between 1997 and early 2000, based on advice provided by Watson Wyatt during those years. If the statute of limitations applied, the Fund's claims based on Watson Wyatt's allegedly negligent advice during those years would be time-barred. If those claims were excluded, the Fund's estimated damages were between $0 and $24 million. If the statute of limitations did not apply to those claims, however, the Fund's damages would be much higher—in the hundreds of millions of dollars—because the improvements made in the earlier years were the largest.

98. Relying on the discovery rule, the Trustees planned to argue that they did not, and could not have, learned of the severe underfunding until September 2002, years after Watson Wyatt gave its advice on benefit improvements.

99. Compounding the potential statute-of-limitations problem, however, in July 2006, the Michigan Supreme Court, in the case of *Trentadue v. Buckler Lawn Sprinkler*, asked for briefing on the issue of whether Michigan's judge-made discovery rule was inconsistent with the state's statutory scheme governing statutes of limitations. Since the court raised the issue itself, there appeared to be a good chance the discovery rule would be abolished. Application of the discovery rule was so important to the Fund's case that Almonrode filed an amicus brief with the Michigan Supreme Court arguing that abolishing the discovery rule would violate the Michigan Constitution's Due Process Clause and was inconsistent with principles of *stare decisis*. The case was argued in the Michigan Supreme Court in December 2006. The Court ultimately did abolish the discovery rule, *see Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 407, 738 N.W.2d 664 (2007), but because the *Watson Wyatt* litigation had settled shortly before that time, the decision did not affect the litigation.

---

8. The Fund's fraud claims were subject to the six-year statute of limitations under current law, but Watson Wyatt had argued persuasively in a motion for partial summary judgment that the claims were subject to the shorter three-year statute of limitations applicable to actions arising from injuries to persons or property. The motion was heard, but the case settled before the motion was decided.

100. The Trustees properly monitored the progress of the litigation. Sullivan Ward updated the Trustees on all aspects of the litigation at and between Board meetings. Discussion of the litigation at Board meetings took place in executive session, the minutes of which were not recorded. The Trustees were aware of all of Watson Wyatt's potential defenses, including its potential claims that the actions or inactions of the Trustees and Sullivan Ward were the proximate causes of the severe underfunding. The Trustees were given copies of Marc Gertner's expert report discussing the Trustees' and Sullivan Ward's contribution to the shortfall, and copies of Watson Wyatt's facilitation summaries, which included discussions of its legal theory that the Trustees and Sullivan Ward were to blame for the Fund's deficiencies.

101. In September 2006, Almonrode obtained an opinion letter from attorney Philip Thomas regarding Watson Wyatt's theory that Sullivan Ward might be a proximate cause of the harm to the Fund. Thomas opined that the defense was severely under-developed and arguably frivolous. He thought that raising the defense in Watson Wyatt's facilitation statement was likely a litigation strategy designed to drive the client apart from its counsel and obscure the real issues in the case, e.g., Watson Wyatt's own liability and the amount of damages. Thomas suggested that Sullivan Ward notify the Trustees of the potential defense orally and in writing, in order to fully explain the situation to the client. Asher provided the Trustees with a copy of Thomas's opinion letter at the next Board meeting.

102. The Trustees adopted a reasonable process for reviewing litigation expenses as part of their bi-monthly meetings. Dennis Kramer reviewed Sullivan Ward's invoices for errors as they came in. Errors identified were reconciled with Sulli-

van Ward before being paid. Kramer maintained detailed and meticulous records of the expenses and tracked the legal fees incurred so he would know exactly when the $250,000 threshold had been reached. Before Board meetings, Kramer would forward a spreadsheet of the bills to the Trustees. The Trustees reviewed the expense sheets before or at the meetings and then voted on whether to pay the expenses. The Trustees knew that they had the power to challenge Sullivan Ward on the propriety or the necessity of the expenses. At the end of the case, litigation expenses totaled $1,299,620.86. No expense was challenged by Plaintiffs at trial as being excessive or unnecessary to the litigation.

### George Young and Bart Carrigan

103. In the fall of 2005, former-trustee Bart Carrigan replaced James Edwards as an Employer Trustee. Carrigan had served as a trustee on other pension plans in the past and was familiar with the duties of fund trustees.

104. Around the same time, George Young was appointed to the Board to replace Art Ellul as a Union Trustee.

105. Carrigan discussed the *Watson Wyatt* litigation with Almonrode and the Ashers, and he reviewed the entire file. He never asked for additional time to review the file.

106. On June 12, 2006, Carrigan sent a letter to the other Trustees questioning the propriety of the Fund's fee arrangement with Sullivan Ward for the litigation and whether Sullivan Ward's representation of the Fund presented a conflict of interest because the firm might be liable to the Fund for some of the shortfall. Carrigan thought the arrangement could potentially subject the trustees to fiduciary liability. Carrigan wrote that at the next Board meeting he would urge the Fund to

engage "experienced, independent counsel to review this fee agreement. I believe such a review is consistent with our fiduciary duties."

107. At the June 14, 2006 Board meeting, during executive session, the Trustees discussed Carrigan's letter and his concerns with the fee arrangement. Michael Asher presented the Trustees with a letter from attorney Norman Lippitt, who opined that the legal services agreement fully complied with Michigan's Rules of Professional Conduct 1.5 on reasonable compensation.

108. The letter, because it did not discuss ERISA, did not allay all of Carrigan's concerns. The Trustees agreed that a second opinion letter from an attorney with experience in the field of ERISA would be helpful. Anthony Asher asked if the Trustees wanted to obtain the letter themselves. The Trustees wanted Asher to obtain the letter.

109. Asher obtained a letter from Philip Thomas and presented the letter to the Trustees during executive session on August 30, 2006. In the letter, Thomas stated that he had reviewed each aspect of the agreement, and that it appeared the agreement was fair and reasonable and comported with ERISA's requirement that compensation to a service provider be reasonable.

110. At the same meeting, in hopes of putting to rest the issues that Carrigan was continuing to raise, Anthony Asher offered to terminate the agreement and proceed with the litigation on an hourly-rate basis. None of the Trustees, including Carrigan and Young, however, moved to accept the offer, because there was still considerable risk inherent in the litigation at the time.

111. Neither Carrigan nor Young again raised any issue with respect to the fee arrangement until the settlement was reached.

## Settlement

112. At the August 30, 2006 meeting, Sullivan Ward informed the Trustees that Watson Wyatt had proposed resolving the litigation through facilitation. Watson Wyatt made the offer after filing its motion for partial summary judgment on the statute of limitations, a motion that had a significant chance of being granted. It was set for argument on October 18, 2006. In addition, the Michigan Supreme Court had just ordered briefing on the viability of the discovery rule. Thus, the Trustees and Sullivan Ward suspected that Watson Wyatt was interested in facilitating the case only to see if the Fund would settle for a nominal amount. Accordingly, although an offer to facilitate was good news, the Trustees were not overly optimistic that it would lead to a settlement.

113. The Trustees agreed to facilitation. They appointed Hamric (Chairman) and Rogers (Secretary) to attend the facilitation session on behalf of the Fund.

114. Almonrode, Anthony Asher, Hamric, and Rogers attended a facilitation session in New York City on October 3, 2006. All of the discussions between the parties took place through the facilitator. Watson Wyatt made no firm offers.

115. Another facilitation was scheduled. The Trustees again agreed to send Hamric and Rogers. This time the Board authorized them to tentatively accept an offer of $40–$50 million if one were made. The Board would vote later on whether to accept or reject any offer tentatively accepted by Hamric and Rogers.

116. On December 18, 2006, Almonrode, Anthony Asher, Hamric, and Rogers attended the second facilitation session. Sullivan Ward demanded that this session be held in Detroit. The parties made progress toward a settlement. Watson Wyatt did not offer to settle, but it indicat-

ed that it might be open to settling in the range of $40 million.

117. On January 8, 2007, Almonrode, Anthony Asher, Hamric, and Rogers attended a third facilitation in Detroit. More progress was made. Each sides' actuarial experts gave presentations on their theories of liability and damages. The Fund's expert told Sullivan Ward in private that Watson Wyatt's calculation of actual damages ($84 million) was a reasonable calculation. Toward the end of the session, Watson Wyatt suggested a settlement in the amount of $90 million. The Trustees suggested a settlement of $120 million. No firm offers, however, were made.

118. After the third facilitation session, discussions among the facilitator and the attorneys continued. Hamric and Rogers retained authority from the Board to tentatively accept an offer on behalf of the full Board. Eventually, Watson Wyatt offered to settle for $100 million. Anthony Asher reported the offer to Hamric and Rogers. Asher said he believed Watson Wyatt could go higher, perhaps to $110 million. Hamric and Rogers authorized Asher to try to push the number higher.

119. The facilitator informed Sharon Almonrode that Watson Wyatt was offering to settle for $110 million, but wanted rights of subrogation to sue other parties, presumably the Trustees and Sullivan Ward.[9] Almonrode told the facilitator that the condition on subrogation was not acceptable to the Trustees because it would drag the Fund and the Trustees into further litigation, which a settlement was intended to avoid. Because the offer was frivolous, Almonrode had no duty to report it to Hamric and Rogers, and she had the authority to reject it without providing details to the two trustees.

120. Soon thereafter, the facilitator informed the Trustees that Watson Wyatt had offered to settle the case for $110 million, with no condition on retaining subrogation rights. Watson Wyatt demanded that the settlement be kept confidential. In fact, Watson Wyatt conditioned its offer to settle on the matter's confidentiality. Public disclosure could have scuttled the settlement entirely.

121. When Hamric and Rogers were told of the $110 million offer, they directed Almonrode and Asher to accept and to prepare the settlement documents for the entire Board's review and approval. Witus understood that acceptance of the offer was conditional upon approval by the entire Board of Trustees.

122. Because of the confidentiality condition, Rogers and Hamric did not report the offer to the other trustees while the settlement documents were being prepared. The Trustees had experienced problems in the past with confidential information from executive sessions being leaked to the public. They did not want to take any chances that information about the settlement would be leaked.

123. For the next two months, the settlement documents were in the drafting process. During this time, Watson Wyatt's attorneys were working to obtain final approval from each of its insurance carriers. Each demanded that specific language be included in the settlement release.

124. Almonrode worked diligently to finalize the settlement documents. There was a significant and real concern that if the settlement was not finalized soon after January 2007, the Michigan Supreme Court's decision in the *Trentadue* case

---

**9.** Notably, Morely Witus, lead counsel for Watson Wyatt does not remember this offer ever being made.

could cause Watson Wyatt or its insurance carriers to reconsider its decision to settle.

125. On March 20, 2007, Almonrode filed a motion to enforce the settlement to push Watson Wyatt to finalize the settlement documents. The strategy worked, and on March 22, 2007, Watson Wyatt obtained final approval from all of its insurance carriers and provided the Trustees with a final settlement agreement. Watson Wyatt never admitted any liability.

126. Sullivan Ward called an emergency meeting to review and approve the settlement agreement.

127. On March 23, 2007, five of the six trustees (all but Carrigan—he was out of town at the time) attended a duly-called meeting of the Board to authorize acceptance of the $110 million offer.

128. The day before the meeting, Rogers spoke with Carrigan on the phone. Carrigan told Rogers that Michael Asher had informed him of Watson Wyatt's offer to settle. Carrigan authorized Rogers to vote on his behalf to accept the settlement amount, but not the attorney fee distribution.

129. At the meeting, Anthony Asher presented the settlement agreement to the Trustees. He said that Watson Wyatt had demanded that the agreement be kept confidential until Watson Wyatt made payment to the Fund. Asher went through the settlement agreement with the Trustees, line by line, paragraph by paragraph, and answered all the Trustees' questions regarding the language. Asher also discussed Sullivan Ward's compensation. He provided a written breakdown of how the settlement amount would be distributed between the Fund and Sullivan Ward. Each Trustee had ample opportunity to review the documents during the meeting.

130. The breakdown was as follows: Sullivan Ward was entitled to $35,983,459.71, which was 1/3 of the net recovery ($110 million minus costs of $1,299,620.86) less the $250,000 the Fund had paid in attorneys fees. The Fund was entitled to the remaining amount of $74,016,540.29.

131. The Trustees, including Young, voted unanimously to accept the settlement offer. Only Carrigan objected to the fee disbursement, though he did so after learning that Rogers had not lodged his objection at the meeting. The Trustees signed a resolution demonstrating their unanimous acceptance of the settlement offer. Hamric and Rogers signed the settlement agreement on behalf of the Fund.

132. At the meeting, Hamric acknowledged the existence of the contingency fee agreement, but asked if Sullivan Ward would be willing to reduce the fee. Asher declined the request, citing the risks that the law firm had taken by agreeing to a contingency arrangement, and the fact that it had originally offered to take the case on an hourly basis and later offered to revert to an hourly structure, offers that the Trustees had declined.

133. None of the Trustees obtained any financial gain from the contingency fee agreement.

134. Neither Sullivan Ward nor the Trustees had imagined that such a result was possible, especially considering the many difficulties they faced at the outset of the litigation.

135. Although it is unknown precisely why Watson Wyatt agreed to settle, and why it settled for $110 million, it seems that one reason for doing so was Sullivan Ward's prosecution of the Fund's claims.

**Dismissal of Claims Against Watson Wyatt and Beginning of the Present Action**

136. On March 26, 2007, Judge Paul V. Gadola held a hearing on the Trustees' motion to enforce the settlement. He af-

terwards dismissed the action without prejudice and ordered that the case be immediately reinstated if payment were not made by April 20, 2007.

137. On April 16, 2007, George Young, through counsel (John Streby), filed a motion to reinstate the action, sought intervenor status, requested an immediate hearing, and asked the Court to stop the disbursement of the attorney fee to Sullivan Ward. Young did not object to the $110 million settlement in the motion; he only objected to the fee.

138. After a hearing on the motion, and on stipulation of the parties, the Court dismissed the action as against Watson Wyatt with prejudice, and ordered that the attorney fee portion ($35,983,459.71) be placed in an interest bearing account until the Court resolved Young's motion.

139. The parties originally contemplated that the Court would conduct an evidentiary hearing at which the parties could offer testimony, documentary evidence, and argument, all in support of their respective positions regarding the propriety of the contingency fee.

140. On June 1, 2007, Young, Weglarz, and Chakur filed an independent action against Sullivan Ward, Anthony and Michael Asher, and the Trustees, alleging various violations of ERISA. *See Young v. Hamric,* No. 07–12368 (E.D.Mich.). The action was eventually consolidated with this one, and discovery began. An evidentiary hearing in the original action was never held.

141. On September 9, 2008, the case was reassigned to the undersigned pursuant to Administrative Order 08–AO–039. *See* docket no. 208.

142. In its ruling on the parties' cross-motions for summary judgment, the Court concluded that, in light of the new action filed by Plaintiffs, there was no reason for it to exercise its inherent authority to con-

sider the propriety of the legal services agreement. Therefore, the only remaining claims in the lawsuit are those that arise under ERISA.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' cause of action is created in federal law, 29 U.S.C. § 1132(a). *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005); *Am. Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916).

2. As of the date of trial, only the following claims remain: 1) that Sullivan Ward breached its fiduciary duties under ERISA; 2) that the Trustees breached their fiduciary duties under ERISA; and 3) that the Trustees caused the plan to engage in a transaction with Sullivan Ward that the Trustees knew at the time was prohibited by ERISA. The Court addresses the claims in that order.

### Sullivan Ward was not an ERISA Fiduciary for Any Purpose

3. Plaintiffs contend that Sullivan Ward breached its ERISA fiduciary duties while prosecuting the *Watson Wyatt* litigation. 29 U.S.C. §§ 1132(a)(2) and 1109(a) provide a cause of action against a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed ... [for] any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a).

4. To prevail on a claim of breach of fiduciary duty under ERISA, a plaintiff must establish: 1) that the defendants are plan fiduciaries; 2) that the defendants breached their fiduciary duties; and 3) that the breach caused harm to the plaintiff. *Brosted v. Unum Life Ins. Co. of Am.,* 421 F.3d 459, 465 (7th Cir.2005).

5. ERISA deems a person to be a plan fiduciary to the extent that the person "exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1002(21)(A). The statute defines a plan fiduciary "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan...." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (internal citation omitted). The statutory definition covers entities that exercise *any* authority or control over plan assets, even if they do not exercise *discretionary* control over assets. *Briscoe v. Fine*, 444 F.3d 478, 490–91 (6th Cir.2006).

[3, 4] 6. Attorneys that do not stray beyond the performance of their "usual professional functions" in providing legal services to a plan will ordinarily not be considered fiduciaries under ERISA. *See* 29 C.F.R. § 2509.75–5(D–1). Nothing in ERISA, however, prohibits an attorney from becoming a fiduciary if the facts show that he or she exercises authority or control respecting the management or disposition of the plan's assets. *Id.; see Custer v. Sweeney*, 89 F.3d 1156, 1162 (4th Cir.1996) ("[M]erely because a person serves as legal counsel to a pension plan does not automatically preclude a finding that the attorney is also an ERISA fiduciary, at least as to some activities."); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 538 (7th Cir.1991) ("[T]here is no *per se* rule that prevents professionals who render advice to an ERISA plan from becoming fiduciaries."). Generally speaking, attorneys do not exercise control over their clients' assets. In the absence of actual control over plan assets, however, where the trustees accept counsel's every recommendation without question or an independent inquiry, such that counsel's influence is so great that it *effectively* has control over the plan's assets, counsel is a fiduciary with respect to those areas over which it exercises control. *See Custer*, 89 F.3d at 1162–63; *Schloegel v. Boswell*, 994 F.2d 266, 271–72 (5th Cir.1993).

7. Sullivan Ward's blanket assertion that the case law "consistently holds" that attorneys are not ERISA fiduciaries is, therefore, wrong. The determination of fiduciary status requires a full consideration of all the facts and circumstances surrounding the attorney's relationship with the plan and its fiduciaries. *See Pappas*, 923 F.2d at 538.

8. The first question, then, is whether Sullivan Ward was an ERISA fiduciary. That is, did it exercise authority or control respecting management or disposition of the Fund's money? The evidence adduced at trial does not support Plaintiffs' claim that it did. Sullivan Ward did not have actual control over the Fund's assets. It billed the Fund for all legal services performed (up to the $250,000) and all expenses incurred. The firm never wrote checks to itself or any other entities on behalf of the Fund for services performed during the litigation. *See, e.g., Briscoe*, 444 F.3d at 494 (holding that third-party administrator of company's health plan was a fiduciary of the plan where it "both had the power to write checks on the plan account (which was partially in [the third-party administrator's] name) and exercised that power before and after its contractual relationship with the Company ended"); *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005) (holding that accountant serving as administrator of dental office's employee-benefits plan was fiduciary when he took part in making disbursements to plan participants and also deposited funds into

business account before writing checks on behalf of plan for insurance products; accountant had "total control over the plan's money while it was in his account"). Nor did Sullivan Ward have any authority to commit Fund assets to itself or third-parties without approval from the Trustees. Before each major step in the litigation, from filing to settlement, Sullivan Ward received actual or tacit approval from the Trustees. In this sense then, Sullivan Ward performed the usual functions of attorneys providing litigation services to a pension plan.

9. Sullivan Ward also did not have effective control over the Fund's assets. The Trustees did not blindly accept, without question or an appropriate independent inquiry, virtually every recommendation that Sullivan Ward made. The Trustees did not delegate their authority to manage the Fund's assets to Sullivan Ward. The Trustees were sophisticated businesspersons. They considered the advice and recommendations of counsel, considered their own views and those of each other, and made the best decision based on the information they had before them at the time. It is apparent from the evidence that it was the *Trustees'* decision to litigate the matter and to hire Sullivan Ward under the terms they did, and not Sullivan Ward's decision.

10. Accordingly, Sullivan Ward was not an ERISA fiduciary for any purpose, and Plaintiffs' breach of fiduciary duty claim against Sullivan Ward must fail. There is no need to address the remaining elements of Plaintiffs' breach of fiduciary duty claim against Sullivan Ward. *See Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("In every case charging breach of ERISA fiduciary duty, then, *the threshold question* is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary ... when taking the action subject to complaint." (emphasis added)). Judgment on this claim will be entered in Sullivan Ward's favor.

## The Trustees Did Not Breach Their Fiduciary Duties

11. Plaintiffs contend that the Trustees breached their fiduciary duties primarily by 1) hiring Sullivan Ward to handle the lawsuit; 2) entering into the fee agreement with Sullivan Ward; 3) failing to monitor the litigation and expenses incurred; 4) declining to revert to an hourly arrangement during the litigation; 5) allowing Sullivan Ward to collect its attorney fee after the settlement; and 6) failing to keep minutes of executive sessions.

12. It is undisputed that the Trustees were fiduciaries under ERISA.

13. A plan fiduciary must discharge his or her duties solely in the interest of the plan participants and beneficiaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

14. ERISA does not require that a fiduciary discharge his duties with the care and skill that a prudent expert would use. *See Donovan v. Cunningham,* 716 F.2d 1455, 1467 n. 26 (5th Cir.1983).

15. "When enforcing these duties, 'the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction.'" *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 426 (6th Cir.2002) (quoting *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996)). Whether a fiduciary has prudently discharged his or her duties

is determined using an objective standard that focuses primarily on the fiduciary's conduct in arriving at an investment decision. *In re Unisys Savs. Plan Litig.*, 74 F.3d 420, 434 (3d Cir.1996); *see also Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir.1999) ("[C]ourts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions."). Trustees are permitted to obtain legal advice regarding the prudence of their investment decisions, but that advice will not insulate them from fiduciary liability for imprudent decisions. *See Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir.1983) ("[R]eliance on counsel's advice, without more, cannot be a complete defense to an imprudence charge."). Plan trustees have a duty to exercise independent judgment after a consideration of all the circumstances.

16. For the reasons that follow, the Trustees' decisions throughout the *Watson Wyatt* litigation comported with the standard of care imposed upon them by ERISA.

17. After Watson Wyatt told the Trustees the Fund was severely underfunded and would soon be unable to pay future benefits, the Trustees took appropriate action to remedy the shortfall. They first obtained a second opinion on the Fund's financial health from AON before proceeding with any changes. When AON confirmed that the Fund was in trouble, the Trustees implemented numerous and diverse remedial measures in an effort to prevent the Fund from being taken over by the PBGC. None of these measures has been challenged in this case.

18. Before deciding to proceed with litigation against Watson Wyatt, the Fund authorized Sullivan Ward to investigate the merits of an action. After a full review of the pros and cons of the potential litigation, the Trustees concluded that a lawsuit would be in the Fund participants' best interests as a necessary step in restoring the Fund to financial health. The Trustees were not imprudent in reaching this conclusion.

19. The Trustees did not act imprudently by retaining Sullivan Ward to prosecute the action, or by doing so without first seeking bids from other law firms. As detailed in the findings above, the Trustees had first-hand experience with Sullivan Ward's competence in matters handled for the Fund in the past. The Trustees knew that the firm was well-respected and had the resources to handle the action. They reasonably believed that it would provide satisfactory services on the present matter. The Trustees were also aware from past experience that larger, national firms charged significantly more than Sullivan Ward, and that interviewing other firms, and bringing them up to speed on the matter, would require substantial investments of both time and money. Those were resources the Fund could not afford to expend, given the state of the Fund's health.

20. The Trustees did not act imprudently by agreeing to the hybrid fee arrangement. Although the Trustees strongly believed that the litigation would last for years, they did not rule out the possibility of an early settlement. The hybrid fee agreement contemplated the possibility of an early settlement by providing for an hourly rate at the beginning of the litigation. The Trustees successfully negotiated a lower threshold for triggering the contingency portion of the agreement. Based on the information available at the time, their decision to agree to the hybrid fee arrangement was prudent.

21. The Trustees properly monitored the cost of the litigation. The Fund paid only necessary expenses. Not one expense has been shown to be unnecessary. Sullivan Ward provided regular updates both during and outside of Board meetings. The Trustees had the final say regarding the settlement, which they unanimously approved.

22. When Anthony Asher offered to revert to an hourly fee arrangement, the Trustees properly considered the offer, but decided that because the potential for any recovery was still bleak, it was best to continue with the contingency fee arrangement.

23. When the case settled, Hamric, with the agreement of the other Trustees, asked if Sullivan Ward would consider returning some of its fee. Anthony Asher declined. The request indicates that neither the Trustees nor Sullivan Ward were aware that the fee arrangement would result in such a large attorney fee. It was only *after* the case had settled that the amount of the contingency fee became known.

24. Although the Trustees could have terminated the fee agreement at any time without penalty, their duty to be prudent did not require them to do so. Plaintiffs' assertion, therefore, that the Trustees should have terminated the agreement in January 2007 to negotiate a lower fee, just when the settlement negotiations with Watson Wyatt were starting to bear fruit, is misplaced. In fact, it likely would have been *imprudent* for the Trustees to terminate the agreement at that point. If, as is likely, Sullivan Ward had refused to lower its rate, it is doubtful that the Trustees would have been able to retain substitute counsel, given the weaknesses in the case, the impending trial date (April 2, 2007), and the time needed to bring the new counsel up to speed.

25. In fact, it is unlikely that any lawyer would have been willing to represent the Fund after learning that the Trustees had fired their former counsel, not because of missteps or a breakdown in the attorney-client relationship, but rather because of counsel's *success* in bringing Watson Wyatt to the negotiating table through its prosecution of the claims, and because counsel would not agree to lower its fee. In that case, the Trustees would have had no choice but to return to Sullivan Ward under their original agreement.

26. Without the appearance of substitute counsel, the Court would have been required to dismiss the action without prejudice since non-lawyer trustees may not represent a trust or its assets in their own right. *See Knoefler v. United Bank of Bismarck,* 20 F.3d 347, 347–48 (8th Cir. 1994); *C.E. Pope Equity Trust v. United States,* 818 F.2d 696, 697–98 (9th Cir.1987); *see also See Rowland v. Cal. Men's Colony,* 506 U.S. 194, 201–02, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel. As the courts have recognized, the rationale for that rule applies equally to all artificial entities." (citations omitted)); *Doherty v. Am. Motors Corp.,* 728 F.2d 334, 340 (6th Cir.1984) (noting that "neither a corporate officer nor a shareholder may appear on behalf of the corporation").

27. In any case, it is doubtful that the Court would have granted Sullivan Ward leave to withdraw at that point, given that trial was less than four months away and there was no real breakdown in the relationship. *See* E.D. Mich. LR 83.30(a) ("Withdrawal of appearances may be accomplished only by leave of Court on motion of counsel."); *see also* Mich. R. Prof'l Conduct 1.16(c) ("When ordered to do so by a tribunal, a lawyer shall continue rep-

resentation notwithstanding good cause for terminating the representation.").

28. Plaintiffs have placed far too much reliance on *Kouba v. Joyce,* No. 83 C 451, 1987 WL 33370 (N.D.Ill. Dec. 31, 1987). There, pension plan trustees hired a prominent eminent domain attorney to represent the plan in an eminent domain proceeding against the City of Chicago. The trustees retained the attorney on a contingency fee basis, along with a $40,000 upfront retainer payment. When the lawyer obtained a large settlement from the city, he consequently obtained a large fee for himself. A pension plan member sued the trustees alleging that they had entered into a transaction they should have known was prohibited under ERISA. Although the court considered only whether the fee arrangement was a prohibited transaction under 29 U.S.C. §§ 1106(a) and 1108(b)(2), in doing so the court concluded "that, at the time they entered the contingency fee agreement, the Trustees carefully and prudently determined that the particular fee agreement would be in the Fund's best interests." *Id.* at *7. It granted summary judgment in favor of the trustees. *Id.* at *8.

29. Contrary to Plaintiffs' assertions, *Kouba* does not establish the required standard for meeting one's fiduciary duties under ERISA. Simply because the trustees' decisionmaking process in *Kouba* was deemed prudent as a matter of law, does not require a further finding that the Trustees here were imprudent when they did not follow those same procedures. The trustees in *Kouba* did not have past experience with an eminent domain attorney that they could hire without considering other options. Here, by contrast, the Trustees did have experience with a law firm they knew could handle the litigation well. Therefore, they did not need to interview a panel of law firms before hiring Sullivan Ward or obtain independent advice as to whether Sullivan Ward was the proper firm to handle the litigation.

30. The Trustees' decision to handle all business related to the litigation in executive session without keeping minutes did not breach their fiduciary duty to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Although the Trust Agreement requires that "a written record ... shall be kept of all business transacted and of all matters upon which voting shall have occurred," the Trustees reasonably interpreted the Agreement to permit them to hold executive sessions, where minutes were not kept. That interpretation is conclusive and binding.

31. Throughout the litigation, with the exception of the advice obtained from Norman Lippitt and Philip Thomas, the Trustees did not seek legal advice from outside counsel regarding the prudence of retaining Sullivan Ward for the *Watson Wyatt* litigation. Their duty to exercise prudence did not require them to do so. *See Ashenbaugh v. Crucible Inc., 1975 Salaried Ret. Plan,* 854 F.2d 1516, 1531 (3d Cir.1988) ("[I]f [Congress] had intended to impose a requirement that plan administrators consult outside counsel in the course of their administration, it would have made this intention clear in the statute.").

32. The Trustees were volunteers and did not receive personal financial gain by hiring Sullivan Ward or settling the action on the terms that they did. There is no evidence of self-dealing, kick-backs, or any other misconduct by the Trustees.

33. Plaintiffs have not carried their burden to demonstrate by a preponderance of the evidence that the Trustees breached their ERISA fiduciary duties. Judgment on this claim will be entered in the Trustees' favor.

**The Fee Agreement was Not a Prohibited Transaction**

34. Plaintiffs' remaining claims address, in one way or another, whether the fee agreement was one that ERISA prohibits. *See* Second Amend. Compl. Counts II(G) and (I), V, VI, and VI.

35. ERISA prohibits a plan fiduciary from causing the plan to engage in a transaction "if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

36. A "party in interest" is "a person providing services to [a] plan." *Id.* § 1002(14)(B). Under ERISA, the term "person" includes corporations. *Id.* § 1002(9). Sullivan Ward was a party in interest for purposes of the *Watson Wyatt* litigation.

37. "Section 406(a)(1) [29 U.S.C. § 1106(a)(1) ] is designed to prohibit transactions that would clearly injure the plan. Congress adopted § 406 to prevent employee benefit plans from engaging in transactions that would benefit parties in interest at the expense of plan participants and their beneficiaries." *Jordan v. Mich. Conference of Teamsters Welfare Fund,* 207 F.3d 854, 858 (6th Cir.2000) (internal citation omitted).

38. The prohibition on certain transactions, however, does not prevent a plan from "[c]ontracting or making reasonable arrangements with a party in interest for ... legal ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2).

39. Accordingly, for a transaction between a plan and service provider to be permitted, 1) the contract or arrangement must be reasonable, 2) the services must be necessary for the operation of the plan, and 3) no more than reasonable compensation may be paid for the services.

40. Taking the second element first, there is no dispute that the litigation was necessary for the operation of the Fund.

41. Turning next to the first element, the contract itself was reasonable. When a plan enters into a contingency arrangement with a service provider, if the arrangement is reasonable at the outset, then payment of the fee is also reasonable at the end of the litigation. *See Kouba,* 1987 WL 33370, at *6. It is inappropriate to look at the final amount of compensation paid to determine whether the arrangement is reasonable. *Id.*

42. Based on the facts and circumstances that existed at the time the agreement was made, including the risks associated with the litigation and the Fund's precarious financial situation, the contract was reasonably structured. It protected the Fund in the event there was no recovery after years of litigation, in which case the Fund would only have paid $250,000 in attorney's fees. It also permitted the Fund to pay for the litigation without using an excessive amount of its assets. The fact that in the event of a large recovery Sullivan Ward would be generously compensated did not make the arrangement unreasonable.

43. The absence of a cap on Sullivan Ward's compensation in the event of a large recovery also did not make the arrangement unreasonable. A cap could have subconsciously disincentivized Sullivan Ward from pursuing a top-dollar settlement. Indeed, a cap may have dissuaded Anthony Asher from obtaining authorization from Hamric and Rogers to push Watson Wyatt to increase its $100 million offer to $110 million.

■■ 44. To be reasonable, a contract or arrangement must allow for termination on "reasonably short notice," without penalty, to "prevent the plan from becoming locked into an arrangement that has become disadvantageous." 29 C.F.R. § 2550.408b–2(c).[10] Contrary to Plaintiffs' assertion, however, an express termination provision in a written contract is not required. *See Bona v. Barasch*, No. 01 Civ. 2289, 2003 WL 21222531, at \*5 (S.D.N.Y. May 27, 2003). As the court in *Bona* noted, "absent evidence of an intent to violate the law, the parties to a contract are presumed to have accepted all obligations imposed on their relationship by state or federal law. Relevant statutes and regulations are incorporated into each contract as implied terms." *Id.* at \*6. "Thus, to the extent that short-term termination provisions are mandated by ERISA § 406(a), they are properly read into the agreements between the trustees and the service providers." *Id.*

■■ 45. Accordingly, while the fee agreement did not expressly indicate that it could be terminated it at any time, such a provision was a part of the contract by operation of federal law. Moreover, Michigan law provides that "a client has an absolute right to discharge an attorney and is therefore not liable under the contract for exercising that right." *Polen v. Reynolds*, 222 Mich.App. 20, 25, 564 N.W.2d 467 (1997). The client's only obligation is to pay the reasonable value of the attorney's services under the principle of quantum meruit. *Id.* In the event that a contingency fee agreement is terminated after 100% of the services has been performed, the reasonable value of the services is measured not by a reasonable hourly rate multiplied by the number of hours expended, but rather by the percentage of recovery called for in the parties' contract. *See Radulovich v. Evola*, No. 217630, 2001 WL 682438, at \*3 (Mich. Ct.App. Apr. 24, 2001) (per curiam); *accord Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 650, 653 (11th Cir.1990) ("[T]he occurrence of the contingency prior to discharge of the attorney entitles that attorney to his stated fees pursuant to the contingency fee contract as opposed to quantum meruit." (applying Florida law)).

46. Requiring a plan to pay the reasonable value of the attorney's services does not impose a "penalty" on the plan. *See* 29 C.F.R. § 2550.408b–2(c) ("A provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement or lease is not a penalty.").

■■ 47. Turning finally to the third element, the agreement did not provide for more than reasonable compensation. "[W]hether compensation is 'reasonable' under [§ 1108(b)(2) ] depends on the particular facts and circumstances of each case." 29 C.F.R. § 2550.408c–2(b)(1). Compensation that could be deemed excessive under 26 C.F.R. § 1.162–7(b)(3), a tax regulation that offers guidance on the deductibility of compensation for personal services that constitute ordinary and necessary trade or business expenses, will not be "reasonable compensation" under § 1108(b)(2). Passing muster under the

---

**10.** New Labor Department regulations, which set forth in considerably more detail the requirements of "reasonable contracts or arrangements" between pension plans and service providers, became effective July 16, 2011. *See Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, 75 Fed. Reg. 41600, 41635 (to be codified at 29 C.F.R. pt. 2550). The regulations do not apply here. *See id.* at 41638 (providing that new regulations "shall apply to contracts or arrangements between covered plans and covered service providers as of the effective date, without regard to whether the contract or arrangement was entered into prior to such date").

tax regulation, however, does not correspondingly render compensation reasonable under ERISA. *Id.* § 2550.408c–2(b)(5). According to the tax regulation, reasonable compensation is "only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned." 26 C.F.R. § 1.162–7(b)(3).

48. The contingency-fee arrangement here was reasonable. A one-third contingency fee arrangement is common in litigation. It does not matter whether the client is an individual, association, or corporation, rich or poor. The hourly-fee portion of the arrangement was also reasonable, given that the rate charged was lower than would have otherwise been charged had the entire arrangement been on a hourly fee basis. The agreement as a whole properly accounted for the risks of ligation faced by both Sullivan Ward and the Trustees. Because the agreement contemplated no more than reasonable compensation when it was made, then when Sullivan Ward was paid, the compensation was also reasonable. In the words of the tax regulation, the fee arrangement provided only for compensation "as would ordinarily be paid for like services by like enterprises under like circumstances."

49. Because the fee agreement was a reasonable arrangement for necessary services and resulted in no more than reasonable compensation to Sullivan Ward, the Trustees were not prohibited from entering into it.

50. Even were it permissible to find the compensation unreasonable in hindsight, however, the transaction providing it is still permissible. Absent intent by the Trustees at the time they entered the agreement to "benefit parties in interest at the expense of plan participants," which intent is not present here, the transaction was permitted under §§ 1106(a)(1)(D) and 1108(b)(2). *See Jordan,* 207 F.3d at 860–61 (following *Reich v. Compton,* 57 F.3d 270, 278 (3d Cir.1995), and concluding a transaction prohibited by ERISA requires subjective intent on the part of a plan fiduciary to benefit the party in interest). *But see Chao,* 285 F.3d at 441 n. 12 (expressing strong doubt regarding *Jordan's* subjective intent requirement for prohibited transactions); *see also Koussan v. Holder,* 556 F.3d 403, 409 n. 4 (6th Cir. 2009) ("A panel of th[e] [Sixth Circuit] may not overrule the decision of another panel absent an inconsistent opinion from the United States Supreme Court or an *en banc* reversal of [the circuit's] earlier position."). Judgment on this claim will be entered in favor of the Trustees and Sullivan Ward.

### ORDER

**WHEREFORE,** it is hereby **ORDERED** that the Trustees' motion for judgment on partial findings is **DENIED.**

**IT IS FURTHER ORDERED THAT** judgment shall be entered in favor of the Trustees and Sullivan Ward, and against Plaintiffs.

**IT IS FURTHER ORDERED** that upon entry of the judgment, Sullivan Ward will be entitled to disbursement of the entire contingency fee portion of the settlement amount currently being held in its interest bearing account pursuant to the Court's order of April 30, 2007.

A separate judgment shall follow.

**SO ORDERED.**